# Condensed Transcript
# Testimony of:

## ANTHONY COLASURDO

## Date: February 19, 2013

Alavez-Lopez, et al. v. South Jersey Sanitation Company, Inc., et al

No.:  USDC NJ 1:10-cv-05647

R&K Reporting Inc.
PO Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
Fax: 215-949-1867
Email: rkreporting@gmail.com

**1**

```
                    ----------------------------------
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
                    ----------------------------------
                              - - -
 JAVIER ALAVEZ-LOPEZ, ANTONIO  : CIVIL ACTION
 HERNANDEZ, WILLIAM TOVILLA,    :
 ALEJANDRO CONSTANTINO,         :
 ANTONIO GUTIERREZ, MARCO       :
 ANTONIO ORTEGA, on behalf of   :
 themselves and those           :
 similarly situated             :
                    Plaintiffs,  :
            vs.                  :
                                :
 SOUTH JERSEY SANITATION        :
 COMPANY, INC. and ANTHONY      :
 COLARSURDO                     :
                    Defendants. :  NO. 1:10-CV-05647

                              - - -

            TUESDAY, FEBRUARY 19, 2013

                              - - -

        DEPOSITION of ANTHONY COLASURDO, held in the
 Law Offices of SWARTZ SWIDLER, LLC, 1878 Marlton
 Pike, Suite 10, Cherry Hill, New Jersey 08003,
 at approximately 1:30 p.m., on the above date,
 before Kimberly A. Little, a Registered
 Professional Reporter, New Jersey Certified
 Court Reporter and Notary Public in and for the
 Commonwealth of Pennsylvania.

                              - - -

                    R&K REPORTING INC.
                   Court Reporting Services
                       PO Box 1972
                   Levittown, Pennsylvania 19058
        Phone 215-946-7009    Fax 215-949-1867
```

**2**

```
 APPEARANCES:
 SWARTZ SWIDLER, LLC
       BY:   JUSTIN L. SWIDLER, ESQUIRE
             1878 Marlton Pike
             Suite 10
             Cherry Hill, New Jersey  08003
             856-283-3525

       -- Representing the Plaintiffs


 COOPER, LEVENSON, APRIL
 NIEDELMAN & WAGENHEIM, P.C.
       BY:   ALYSON M. TOMLJENOVIC, ESQUIRE
             1125 Atlantic Avenue
             Atlantic City, New Jersey 08401
             609-572-7438
             atomljenovic@cooperlevenson.com
       -- Representing the Defendants
```

**3**

```
                      I N D E X

 WITNESS:   ANTHONY COLASURDO

 EXAMINATION                                  PAGE

 By Mr. Swidler                                 4




                    E X H I B I T S

 MARKED           DESCRIPTION               PAGE

                  (None marked)




                 DOCUMENT REQUESTS

                  PAGE/LINE

                    19/19

                    49/07
```

**4**

```
                      - - -
                  PROCEEDINGS
                      - - -
          (It is agreed by and between
       counsel for the respective parties
       that the signing, sealing, filing, and
       certification are hereby waived, and
       that all objections, except as to the
       form of the question, be reserved
       until the time of trial.)
                      - - -
          ANTHONY COLASURDO, having been
       duly sworn, was examined and testified
       under oath as follows:
                      - - -
       BY MR. SWIDLER:
          Q.   Can you please state your name for
       the record?
          A.   Pardon me?
          Q.   Can you please state your name for
       the record?
          A.   Anthony Colasurdo.
          Q.   Mr. Colasurdo, do you go by Tony or
       Anthony?
          A.   Anthony.
```

---

**5**

1  Q.  My name is Justin Swidler.  I
2  introduced myself to you briefly while we were
3  off the record.  You can call me Justin.  I am
4  going to call you Anthony, as long as that is
5  okay with you?
6  A.  That is perfectly fine.
7  Q.  I am going to go through a few ground
8  rules for you today.  It's probably the same
9  rules you were told before in your deposition
10  as a designee in this case and it's likely your
11  attorney went over those rules with you today
12  or earlier.  But I'm just going to go over them
13  now, so we're clear.
14      The first rule today is, it's
15  very important that you do not guess at any of
16  my questions.  That can mean two things.  It
17  can either mean that you didn't hear or
18  understand the question and you're guessing at
19  what my question was, or it could mean you have
20  no idea of the answer and you're just taking a
21  wild stab in the dark.  I don't want you to do
22  either of those.  So if you don't know an
23  answer, tell me you don't know and if you do
24  not understand a question that I have asked,
25  ask me to repeat or rephrase it.  Do you

---

**6**

1  understand that?
2  A.  Yes, I do.
3  Q.  If you do answer a question today, we
4  are going to assume now and a jury will assume
5  later that you understood it.  Is that fair?
6  A.  Yes.
7  Q.  The second rule today, it's important
8  that we don't speak over each other.  You will
9  notice there is a court reporter sitting to
10  your right and her job is to take down
11  everything both of us say.  For that reason,
12  please just let me finish every question before
13  you start answering and, likewise, I will let
14  you finish every answer before I begin my next
15  question.
16      Do you understand that?
17  A.  I do.
18  Q.  If I do cut you off today, it's by
19  mistake.  It means I thought that you were done
20  testifying.  Just let me know that so that you
21  can finish your answer.  Do you understand
22  that?
23  A.  I do.
24  Q.  All right.  Finally, I don't expect
25  to have you here too long.  You did testify

---

**7**

1  earlier as a designee witness; however, if you
2  need to take a break for any reason, the only
3  rule is there cannot be a question pending in
4  front of you when we go on break.  Do you
5  understand that?
6  A.  Yes.
7  Q.  Mr. Colasurdo, what businesses do you
8  currently own?
9  A.  South Jersey Sanitation Company.
10  Q.  Okay.  And how many hours per week do
11  you work?
12  A.  I have a question.
13  Q.  Yes.
14      MS. TOMLJENOVIC:  Wait.
15      THE WITNESS:  I just broke the
16  rule.  If I own another business, do
17  you want to know that as well?
18  BY MR. SWIDLER:
19  Q.  I would like to know that.  I am not
20  going to go too much into it, but I would like
21  to know, yes.
22  A.  I own another, a real estate company
23  with my sister.
24  Q.  Okay.  Do you have any employment
25  other than at those two companies?

---

**8**

1  A.  No.
2  Q.  And how much of your time do you
3  spend in the real estate venture, per week?
4  A.  About 10 hours.
5  Q.  How much time do you spend working
6  for South Jersey Sanitation Company each week?
7  A.  60 to 75 hours.
8  Q.  What time does your day typically
9  start at South Jersey?
10  A.  There is no typical.  Each day is
11  different, of my day in particular.
12  Q.  Okay.  I understand each day is
13  different, but, for instance, I understand that
14  you open up at 4:30 in the morning and close at
15  the 11:00 at night.  Is that accurate?
16  A.  The facility is opened.
17  Q.  That is Hammonton?
18  A.  Yes.  I do not personally every day
19  turn the key and put the lights on, nor do I
20  lock up and shut the lights out every night.
21  Q.  You typically start your day at 9:00,
22  correct?
23  A.  Me at the office, yes.
24  Q.  But normally your day runs from 9:00
25  in the morning until about 9:00, 10:00 at

9

1    night, correct?
2        A.   Yes.
3        Q.   And that's not necessarily all at the
4    physical location in Hammonton?
5        A.   That is correct.
6        Q.   Okay.  And how much of that time is
7    at the physical location in Hammonton?
8        A.   I can't answer that question.
9        Q.   All right.
10       A.   It would be a guess and you told me
11   not to.
12       Q.   You can give me a range.  I mean, you
13   know the answer, so it's not a guess.  The
14   problem is that it's not consistent, correct?
15       A.   Yes.
16       Q.   So give me the range of when you
17   typically get to Hammonton.
18       A.   I can't do that.  I can't honestly
19   answer that question.
20       Q.   So typically might be 9:00 and some
21   days it might be later; is that fair?
22       A.   I'm not going to say that typically
23   it is 9:00.  It can be 9:00.
24       Q.   It can be 9:00 and it can be later
25   than 9:00?

10

1        A.   It can.
2        Q.   Can it be later than noon?
3        A.   Some days.
4        Q.   Okay.  It's fair to say you are not
5    generally at the Hammonton location when the
6    trucks go out in the morning, correct?
7        A.   Not every day.
8        Q.   Not typically?
9        A.   Not typically every day.
10       Q.   Okay.  Not regularly, correct?
11       A.   When I choose to be.
12       Q.   How often is that?
13       A.   I can't answer that question.
14       Q.   Well, is it once a month?
15       A.   Sometimes.
16       Q.   Sometimes it's not once a month?
17       A.   Sometimes it's more.
18       Q.   Sometimes it's how many times per
19   month?
20       A.   I would be guessing.  I --
21       Q.   I think I want to redefine the word
22   guess.  A guess might be if I ask you, for
23   instance, what type of car do I drive.  You
24   don't know the answer to that, I assume, so you
25   would have to guess.  However, if I am asking

11

1    about your own personal experiences, I suppose
2    you could tell me you don't remember, if you
3    don't.  But a guess does not mean that just
4    because you don't have a consistent typical day
5    means you can't answer these questions.
6            When I used the word guess
7    earlier, what I meant is something that you do
8    not know, it is not in your mind and you can't
9    give me any information on it because you don't
10   have that piece of information.  Do you
11   understand what I mean now when I say guess?
12       A.   I would like to go off the record.
13       Q.   No.  There is a question pending
14   before you.
15       A.   I don't understand.
16       Q.   Okay.
17       A.   Is there a question still pending?
18       Q.   Yes, there is.
19       A.   Let me know, my attorney, when I've
20   answered the question.
21       Q.   Okay.  And if you want to say
22   something, say it on the record.
23       A.   I don't.
24       Q.   Okay.  My question to you -- first of
25   all do you know what you do every day?

12

1            MS. TOMLJENOVIC:  Objection to
2        form.
3        BY MR. SWIDLER:
4        Q.   Are you able to testify about what
5    you do every day?
6            MS. TOMLJENOVIC:  Objection to
7        form.  He's already testified.
8            MR. SWIDLER:  He needs to answer
9        the question.  I am not going to let
10       you make speaking objections today.
11           THE WITNESS:  What was the
12       question?
13       BY MR. SWIDLER:
14       Q.   Are you able to testify about what
15   you do every day?
16           MS. TOMLJENOVIC:  Objection to
17       form.  You can answer.
18           THE WITNESS:  I can't give you a
19       definitive answer as to what I do
20       every day.
21       BY MR. SWIDLER:
22       Q.   I don't want a definitive answer.
23       A.   I run -- I was speaking.  I run a
24   company.  That requires me to do many things,
25   such as being in Cherry Hill today for

13

1  depositions.  I am not at the office, but I am
2  working.
3      Q.  Okay.  So I understand that not every
4  day is typical and things change.  I am asking
5  you for the range.  You've said that sometimes,
6  once per month, you might be in Hammonton when
7  the trucks leave, sometimes it might be twice a
8  month.  I am asking for the range.  Is it
9  between once a month and five times, between
10  once a month and every day?  Whatever the range
11  is, that's what I am asking you for.  I am not
12  imposing any limitation on your answer and I
13  don't expect you to tell me it's the same every
14  month.
15          On average, how many times per
16  month are you in Hammonton when the trucks
17  leave the station in the morning?
18      MS. TOMLJENOVIC:  Objection.
19      You can answer.
20      THE WITNESS:  It never is the
21      same.  It's not something I keep
22      track of.
23  BY MR. SWIDLER:
24      Q.  So you don't remember?
25      A.  No, I can't answer your question.

14

1          MS. TOMLJENOVIC:  Objection.
2  BY MR. SWIDLER:
3      Q.  Do you remember --
4      A.  The question doesn't make sense to
5  me.
6      Q.  Do you remember approximately how
7  many times per month you are at the Hammonton
8  yard when the trucks leave the yard in the
9  morning?
10      MS. TOMLJENOVIC:  Objection.
11      THE WITNESS:  Which month are we
12      talking about?
13  BY MR. SWIDLER:
14      Q.  Over the last six months, do you
15  remember the average amount of times you were
16  in the yard when the trucks left the yard?
17      A.  No.
18      Q.  How about over the last month, do you
19  remember?
20      A.  About.
21      Q.  Okay.  In the last month, about how
22  many times were you at the yard?
23      A.  In the month of February?
24      Q.  In the month of February.
25      A.  Say three times.

15

1      Q.  Okay.  How about in the month of
2  January?
3      A.  Four times.
4      Q.  Okay.  Do you think that's consistent
5  with your general monthly activities?
6      A.  I can't answer that.
7      Q.  Because you don't remember?
8      MS. TOMLJENOVIC:  Objection.
9      THE WITNESS:  No.  Because there
10      is no consistent that I -- I mean,
11      things are just not the same.  They
12      are different.
13  BY MR. SWIDLER:
14      Q.  Is there anyone in your management
15  who is at the yard every morning, or most
16  mornings at least, when the trucks leave the
17  yard?
18      A.  Yes.
19      Q.  Who?
20      A.  Edwin Morales.
21      Q.  Anyone else?
22      A.  There are other drivers, people who
23  work for me.
24      Q.  Sure.  Anyone else that you consider
25  management?

16

1      A.  No.
2      Q.  You would agree with me that Edwin
3  Morales would know certainly better than you
4  would who was at the yard every morning and
5  what time they arrive, correct?
6      A.  I would agree with you based upon the
7  form of your question, yes.
8      Q.  Would you agree with me that
9  Mr. Morales would also know of the times that
10  the trucks leave the yard better than you
11  would?
12      MS. TOMLJENOVIC:  Objection to
13      form.
14      THE WITNESS:  I am going to say
15      no.
16  BY MR. SWIDLER:
17      Q.  Okay.  What personal knowledge do you
18  have regarding what times the trucks leave the
19  yard every morning?
20      A.  I can personally determine what time
21  every truck left the yard, should I choose to,
22  by technology.
23      Q.  Through, like, video cameras?
24      A.  GPS.
25      Q.  So you keep GPS records of the

17

trucks?

A. For certain of period of time, we do.

Q. What period of time do you have GPS records for the trucks?

A. I don't understand the question.

Q. South Jersey Sanitation has GPS records relating to the trucks, correct?

A. They are not printed. I mean, we don't print them every day.

Q. I understand.

A. We have GPS on the vehicles.

Q. And --

A. If I choose to track a vehicle, we can raise it on the computer screen.

Q. If you don't choose to track the vehicle, is the vehicle's movements recorded on the computer?

A. It is.

Q. So right now South Jersey has in its possession GPS records for some of the trucks; is that correct?

A. Yes.

MS. TOMLJENOVIC: Objection to form.

BY MR. SWIDLER:

18

Q. Does it have GPS records for all of the trucks?

A. Most of them.

Q. How long has South Jersey Sanitation been maintaining those records?

A. About a year.

Q. You started keeping those records about a year ago?

A. And the GPS system also was a year old.

Q. Why did you install the GPS system?

A. So I could track my trucks. And to add, it may even be a couple of months longer than a year. That was a range. Again, I can't tell you the exact date.

Q. So these GPS records would show the exact time the truck left the yard every morning, correct?

A. If they are working properly.

Q. And they would show the exact time the truck came back to the yard every day, correct?

A. If they were working properly, yes.

Q. Are you aware that in this lawsuit we have asked for any records that you have that

19

would relate to the time that the throwers worked?

A. I am.

Q. Are you aware that one of the records South Jersey Sanitation produced were time records for the truck drivers?

A. Yes.

Q. Do you understand that that was because those were allegedly the most accurate records South Jersey had regarding when the trucks left the station?

A. What I didn't even think about were the GPS records. I just never occurred to me.

Q. Until now?

A. Until now, yeah.

Q. How long would it take you to get those records to your attorney?

A. I don't know.

Q. All right. I am reserving the right to call you back and I'm reserving the right to call Mr. Morales back and I'm reserving the right to call a 30(b)6 deposition. I am going to have to contact the Court based on the deadline. We expect to have those records turned over immediately. You can speak to your

20

attorney about this request.

MR. SWIDLER: Do I need to put it in writing to you?

MS. TOMLJENOVIC: Yes, you do. We will most likely object to it.

MR. SWIDLER: Okay. Why don't after this dep we get the Judge on the phone so you can talk to her about your objection now, because we have --

MS. TOMLJENOVIC: Well --

MR. SWIDLER: I am going to call the Judge.

MS. TOMLJENOVIC: Go ahead and call her.

BY MR. SWIDLER:

Q. You have these records going back about one year?

A. I'm guessing, again --

Q. About a year, you're estimating, correct?

A. Again, I am guessing. It could be shorter. I have to check my records.

Q. What computer are these records saved on?

21

1   A.   I don't know.  I mean, it's a system
2   that I have people run.  I have very limited
3   skills with running that, to answer your
4   question, about the program or the system.
5   Q.   Who runs the system?
6   A.   It runs itself.
7   Q.   You said you have people who run it?
8   A.   When I have a question, I go to ask
9   someone, Edwin Morales.  One of my people in
10  the office can pull up a truck on the certain
11  date to see what it is I might be looking for.
12  Q.   So Mr. Morales is the person who
13  knows how to use the system?
14  A.   He does have knowledge of the system.
15  Q.   He's the person you go to when you
16  need information about the GPS records
17  coordinates of the truck?
18  A.   I said he was one of the people.
19  Q.   Who are the other people?
20  A.   People in my office.
21  Q.   Tell me who they are by name, please.
22  A.   You want names?
23  Q.   I want names.
24  A.   Okay.  You didn't ask before.
25  Q.   When I say who, I think it infers

22

1   names, but that's okay.  We will be a lot
2   longer today if this is the way we are going to
3   do this.
4        MS. TOMLJENOVIC:  Objection.
5        THE WITNESS:  I have nothing but
6   time, but I do feel I am being
7   badgered and I am raising my
8   complaint right now and I would like
9   to have my attorney speak to the
10  judge about your behavior.
11       MR. SWIDLER:  We absolutely will
12  be calling the judge during the
13  deposition.  It is a promise I will
14  make to you if you want me to.
15  Nevertheless, you need to answer the
16  question.
17       THE WITNESS:  What was the
18  question again?
19  BY MR. SWIDLER:
20  Q.   The question was, other than Mr.
21  Morales, please tell me who uses the GPS system
22  that tracks the trucks?
23  A.   Dina Badliacco.
24  Q.   Anyone else?
25  A.   Yes.  Lisa DeRossi.

23

1   Q.   Anybody else?
2   A.   Yes.  Michele Bauer.  That is all.
3   Q.   Okay.  So the people who use the GPS
4   system are Mr. Rodriguez, Ms. Badliacco,
5   Ms. DeRossi, and Ms. Bauer?
6   A.   Who is Mr. Rodriguez?
7   Q.   I'm sorry.  I didn't mean
8   Mr. Rodriguez.  Mr. Lopez -- no, not Lopez.
9   A.   Who is Mr. Lopez?
10  Q.   You know who I'm talking about.
11  A.   This is your deposition, my friend.
12  Q.   Mr. Morales, excuse me.  Those are
13  the only people, correct?
14  A.   Who are we talking about?
15  Q.   Mr. Morales, Ms. Badliacco, Ms.
16  DeRossi, and Ms. Bauer are the four people who
17  know how to use the GPS system, correct?
18  A.   Yes, sir.
19  Q.   So when you want information of the
20  coordinates of the truck, you ask one of those
21  four, correct?
22  A.   Yes.
23  Q.   So do you know how to use the system
24  yourself?
25  A.   No.

24

1   Q.   So when I asked you earlier if it's
2   true, that Mr. Morales had the most accurate --
3   new better than you did what time the trucks
4   left every morning, that is accurate, isn't it?
5        MS. TOMLJENOVIC:  Objection to
6   form.  You can answer.
7        THE WITNESS:  Yeah.  I thought I
8   answered your question as fairly as I
9   could.  And you asked me, I believe,
10  how would I know how what times
11  trucks left if I wasn't there.  I
12  mentioned there is a GPS system and I
13  could pull up to check a vehicle.
14  BY MR. SWIDLER:
15  Q.   And then somebody would tell you what
16  that information was?
17  A.   Or they would print it for me.
18  Q.   Okay.  And how often do you do that?
19  A.   Whenever I feel like it.
20  Q.   How often was that, once a month?
21  A.   You're asking me an impossible
22  questions.
23  Q.   You installed it a year ago.  How
24  many times have you done that since the system
25  has been installed, approximately?

25

1     A.   I don't know.
2     Q.   Has it been more than one time?
3     A.   It has.
4     Q.   Has it been more than five times?
5     A.   Yes.
6     Q.   Has it been more than 20 times?
7     A.   Yes.
8     Q.   Has it been more than 50 times?
9     A.   I don't know.
10    Q.   When is the most recent time you ran
11    the GPS data?
12    A.   Repeat that again.
13    Q.   When is the most recent time you
14    reviewed the GPS data from one of your trucks?
15    A.   Last week.  Today is Tuesday, the
16    19th of February, I think Thursday, which would
17    be the 14th of February, Valentine's Day.
18    Q.   Why did you run it on that day?
19    A.   I wanted to see how long a particular
20    route was taking, I was looking into one of my
21    drivers.
22    Q.   Which driver?
23    A.   Glenn Onkay.
24    Q.   Which route does he run?
25    A.   Front load route.

26

1     Q.   What location does he go to?
2     A.   All over, I mean, he wasn't -- he was
3     picking up commercial customers.
4     Q.   He wasn't doing residential trash
5     pickup?
6     A.   No.
7     Q.   Did you ever run the GPS data for a
8     truck that does residential trash pickup?
9     A.   Say that again, please.
10    Q.   Have you ever run the GPS data for a
11    truck that does residential trash pickup?
12    A.   Myself personally, no.
13    Q.   Have you ever reviewed the GPS data
14    for a truck that runs residential trash pickup?
15    A.   Yes.
16    Q.   When is the most recent time you did
17    that?
18    A.   Don't recall.
19    Q.   How many times have you done that,
20    more than five times in the last year, reviewed
21    data specifically for a residential trash
22    pickup truck?
23    A.   No.
24    Q.   Okay.
25    A.   Wait a minute.  When you say, last

27

1     year, do you mean --
2     Q.   The going back --
3     A.   Calendar year or 12 months?
4     Q.   I mean 12 months.
5     A.   Then the answer is yes --
6     Q.   Okay.
7     A.   -- that I have reviewed GPS on a
8     residential route within the last 12 months,
9     more than five times.
10    Q.   More than five times?  Okay.  But not
11    last year?  When you said you hadn't done it in
12    the last year, so I am trying to understand
13    that answer now.
14    A.   You asked me if I had -- this is
15    going to be quite tedious if I have to remember
16    everything that you ask me.  But I believe
17    you've asked me if during the last year I have
18    reviewed a residential truck more than five
19    times.  And my answer was no, because in my
20    head, I'm thinking -- and that is why I
21    clarified, do we mean from January 1 to today
22    or the last 12 months.
23    Q.   So last year --
24    A.   That is why I asked you that
25    question.

28

1     Q.   Just so I know how to phrase my
2     questions better, last year to you means 2013?
3     A.   Last year to me --
4          MS. TOMLJENOVIC:  Objection to
5          form.
6          THE WITNESS:  I think you need
7          to specify the time frame you're
8          asking me a particular question
9          about.
10    BY MR. SWIDLER:
11    Q.   I want to make sure I ask my
12    questions the way you can understand them.
13    When I say, last year, do you think that means
14    2013?
15    A.   It can be whatever period you want me
16    to think.
17    Q.   Is that what you think it means?
18    A.   In that particular way you phrased it
19    the first time when you asked me that question,
20    you said in this past year, to me, that meant
21    the year we are in, the way --
22    Q.   I didn't say in this past year.  You
23    had it right the first time.
24    A.   That is what I thought you said.
25    Again, I am not going to remember what it is

29

1    you said.
2           THE WITNESS:  And, again, for
3       the second time, I feel like I am
4       being badgered by this young man.
5    BY MR. SWIDLER:
6       Q.   I am allowed to figure out why you're
7    changing your responses.  That's part of my
8    job, in fact.  I wouldn't be doing my job if I
9    didn't do that.  I will be doing that
10   throughout this whole deposition.
11      A.   My personal opinion on that is, since
12   you can't remember a person's name that you
13   deposed not long ago, why am I being held to a
14   higher standard than you when it comes to
15   remembering what you said, when you can't
16   remember it yourself.
17      Q.   I wasn't asking what my question was.
18   I am asking what you meant by last year.  When
19   you repeated my question, you had it right.  So
20   I think you remembered it just fine.
21           Have you reviewed the GPS data
22   for a residential trash pickup truck more than
23   10 times in the last year, which would go back
24   12 months?
25      A.   Yes.

30

1       Q.   How many times have you reviewed it?
2       A.   I don't know.
3       Q.   It's more than 10.  Give me a number
4    that it's less than?
5           MS. TOMLJENOVIC:  Objection to
6       form.
7           THE WITNESS:  I can't answer
8       that question.  Your questions are
9       nonsensical.
10   BY MR. SWIDLER:
11      Q.   Do you not understand the question?
12           MS. TOMLJENOVIC:  Objection.
13           THE WITNESS:  I understand how
14       you are asking them.
15   BY MR. SWIDLER:
16      Q.   Do you not understand my question?
17      A.   You are asking for a number I cannot
18   give you truthfully.
19      Q.   I am asking you what the outer limits
20   of the amount of times that you reviewed the
21   data are.  Certainly you can give me a range.
22           MS. TOMLJENOVIC:  Objection.  He
23       testified he can't.
24           MR. SWIDLER:  It's not credible
25       that he can't.

31

1    BY MR. SWIDLER:
2       Q.   You can give me a range, sir.
3           MS. TOMLJENOVIC:  That is his
4       testimony.
5           MR. SWIDLER:  No speaking
6       objection.  You know that.
7           MS. TOMLJENOVIC:  Let's stop and
8       call the judge.  Enough is enough
9       with this.
10   BY MR. SWIDLER:
11      Q.   I am allowed to ask you for an
12   estimate on range.  You have told me it's more
13   than 10 times.
14           MS. TOMLJENOVIC:  I said we are
15       going to call the judge.
16           THE WITNESS:  May I ask
17       something of my attorney?
18           MS. TOMLJENOVIC:  No.  You can't
19       talk to me now that the deposition
20       has started.
21           THE WITNESS:  I'm done until we
22       speak to the judge.  I am done.
23           MS. TOMLJENOVIC:  Let's speak to
24       the judge.
25           MR. SWIDLER:  Okay.  So I just

32

1    want to understand.  I want to make
2    sure I can explain to the judge what
3    you're telling me.  You're
4    refusing --
5           THE WITNESS:  You can explain to
6       the judge exactly what I am going to
7       tell him.
8           MS. TOMLJENOVIC:  You are not
9       going to speak to the judge.
10          MR. SWIDLER:  And it's a her.
11          THE WITNESS:  Okay.  Regardless.
12      You are badgering me.  I am willing
13      to be here and answer any question
14      that you ask that makes sense to the
15      best of my ability.
16   BY MR. SWIDLER:
17      Q.   I'm allowed to ask you for estimates.
18   You are the only person who would know how many
19   times you viewed this data.
20      A.   I am not going to sit here and argue
21   with you.
22      Q.   I am not arguing with you.
23          MS. TOMLJENOVIC:  Let's just
24      call the judge.
25          THE WITNESS:  I think you are --

33

1       MR. SWIDLER: What is the
2   objection?
3       MS. TOMLJENOVIC: Because you
4   asked the same question 20 times. He
5   says he doesn't recall.
6       MR. SWIDLER: He never said he
7   doesn't recall. He said he won't
8   answer.
9       MS. TOMLJENOVIC: He did say
10  that several times until you badgered
11  him into one --
12      MR. SWIDLER: No. If he says he
13  doesn't recall, we'll move on. If he
14  says he doesn't recall, I'm moving
15  on.
16      MS. TOMLJENOVIC: You can go
17  back and read the whole thing. When
18  he tried to say he didn't recall, you
19  said that is not credible.
20      MR. SWIDLER: No. What he said
21  is he can't answer the question,
22  which is not the same as I can't
23  recall.
24  BY MR. SWIDLER:
25      Q.  Is your testimony you don't know, you

34

1   have no idea, it could be 20 times, it could be
2   500 times, how many times you reviewed the GPS
3   data for residential trash pickup trucks?
4       A.  My answer is, that I cannot give you
5   a specific number of times, even into a range
6   that is between 20 and 500.
7       Q.  Okay. You've answered the question.
8   We can move on.
9           I am just going to show you three
10  documents we marked --
11          THE WITNESS: Are we no longer
12      calling the judge?
13          MS. TOMLJENOVIC: No. We will
14      call him later. We were going to
15      call him with regards to that line of
16      questioning.
17  BY MR. SWIDLER:
18      Q.  These were previously marked 1A, 1B,
19  and 1C. According to your earlier testimony
20  and according to Mr. Morales' testimony, South
21  Jersey Sanitation does not keep specific time
22  records for throwers; is that accurate?
23      A.  Yes, it is.
24      Q.  Okay. And you testified in your
25  previous deposition that that had something to

35

1   do with a union campaign?
2       A.  No.
3       Q.  Okay. Why do you not keep specific
4   records regarding the hours that the throwers
5   work?
6       A.  We just never did. And when it
7   became problematic, I was always of the opinion
8   that we were compensating them very fairly
9   based upon minimum wage and what their hours
10  would have been throughout a year, that
11  sometimes there are longer workdays or shorter
12  workdays than others. And so I gave them what
13  I thought was a very livable wage, commensurate
14  with the industry, so that these men in
15  February can make the same pay or come home
16  with a decent pay as they would in July.
17  February, because there is no hours, they're
18  shorter days. And I use that as a range, if
19  you will. Certain times of year are busier
20  than others. But a man still needs to make
21  enough money to feed his family.
22      Q.  My question to you wasn't why do you
23  pay the truck throwers as you do. My question
24  is, why have you chosen not to keep records
25  regarding the hours they work?

36

1       A.  A lot of the throwers don't come to
2   the physical facility to punch in or out. We
3   pick them up at home. We allow them to use
4   their own transportation if they wish to come
5   to where they are going to work. So they are
6   not necessarily there to punch a clock, a time
7   card.
8       Q.  It's --
9       A.  In further answer your question, you
10  mentioned the union, once this lawsuit was
11  brought, by your firm, because of the union
12  activity that was coming on, we were not
13  allowed by union rules or the National Labor
14  Relations Board to change things we were doing.
15
16      Q.  But the throwers are not part of the
17  union, are they?
18      A.  There is no union, but they were part
19  of the -- I forgot what they call it, but part
20  of the unit.
21      Q.  The bargaining group?
22      A.  The bargaining -- something similar
23  to that.
24      Q.  The throwers, they help, obviously,
25  with residential track pickup, correct?

37

1    A.  Yes.
2    **Q.  Is it your position that their day**
3    **starts when they arrive at the first residence**
4    **where they will be picking up trash?**
5    A.  Yes.  The thrower's day starts when
6    they begin physically to work.
7    **Q.  But what do you mean by that?**
8    A.  That they start putting trash into
9    the vehicle, into the truck.
10    **Q.  How about when they get out of the**
11    **inside of the truck and go on the back of the**
12    **truck, but before they have started picking up**
13    **trash, is that work?  So they are now standing**
14    **on the outside of the truck, but they haven't**
15    **yet arrived at the first residence, would you**
16    **consider that work?**
17    MS. TOMLJENOVIC:  Objection to
18    form.
19    THE WITNESS:  I think that's a
20    very short period of time, because
21    the traveling distance they need to
22    be in the vehicle.  Let's say that
23    when the vehicle they are traveling
24    in pulls up to the first trash can,
25    that is part of their day, that's

38

1    when the workday starts.  I would
2    include the time it takes for them to
3    walk to the back of the truck.
4    BY MR. SWIDLER:
5    **Q.  Maybe this is your answer -- and I'm**
6    **not trying to put words in your mouth.  I want**
7    **to understand.  Do they exit out of the**
8    **passenger part of the truck upon arriving at**
9    **the very first residence they will taking the**
10    **trash out of, or do they exit out of the**
11    **passenger area of the truck before then, if you**
12    **know?  I don't want you to guess.**
13    A.  Well, no.  We have been through this
14    before, when I tried not to guess and then you
15    get mad at me.  I think, to answer your
16    question in the best manner that I can, that
17    they have no reason to get out of the truck
18    before they are ready to start picking up at
19    work, to go to work.
20    **Q.  Okay.**
21    A.  I've never had that particular
22    question posed to me.
23    **Q.  Does a thrower know the specific**
24    **house, the very first house of the route each**
25    **day?  Is that told to the thrower?**

39

1    A.  Many of the throwers know the routes
2    better than the drivers.
3    **Q.  Are the throwers informed before each**
4    **day of work -- it doesn't matter what time --**
5    **prior to the day of work, which house will be**
6    **the first residence they will pick up trash**
7    **from that day?**
8    MS. TOMLJENOVIC:  Objection to
9    form.  You can answer, if you can.
10    THE WITNESS:  I don't know what
11    they know.
12    BY MR. SWIDLER:
13    **Q.  They are riding in the garbage truck**
14    **that they'll be working on, correct?**
15    A.  In some cases.  In most cases.
16    **Q.  Okay.  In other words, they are not**
17    **taking a bus?  They are riding in the garbage**
18    **truck, correct?**
19    A.  They have taken their own
20    transportation to work and we pick them up
21    at -- for instance, and this is the only way I
22    can answer this question, if they are working
23    in Cherry Hill but they live in Vineland, they
24    have the option to take whatever route,
25    whatever transportation they want, to get to a

40

1    spot in Cherry Hill where we'll pick them up.
2    **Q.  So there are specific locations that**
3    **they can report to?**
4    MS. TOMLJENOVIC:  Objection to
5    form.
6    BY MR. SWIDLER:
7    **Q.  That isn't the residence, but it's**
8    **somewhere close to the residences; is that your**
9    **testimony?**
10    A.  They could, if they'd like.
11    **Q.  Okay.  I just want to understand.  If**
12    **they don't do that, they are getting on the**
13    **garbage truck and the garbage truck is driving**
14    **them to the residence, correct?**
15    A.  Yes.
16    **Q.  Okay.  And just so that I can**
17    **understand, do you have any accurate records**
18    **regarding the exact time that the thrower**
19    **starts the workday, as you define that term, in**
20    **other words, when they first start picking up**
21    **trash?  Do you have any records that show that**
22    **time?**
23    A.  Perhaps.
24    **Q.  What records do you have?**
25    A.  If those GPS reports are accurate, I

41

1    can see when the truck starts a residential
2    route. We would be inferring that's actually
3    what they are doing, but there is no video, but
4    we can look at a GPS report to see when it
5    arrives at, you know, 1978 Route 70, and when
6    it starts going from stop to stop.
7         Q.   According to Mr. Morales, there's a
8    number of occasions where employees just don't
9    show up for work, throwers don't show up
10   unannounced.  Do you agree that is a common
11   problem?
12        A.   That happens sometimes.
13        Q.   According to Mr. Morales, it's a
14   pretty common problem.  Do you agree with that?
15            MS. TOMLJENOVIC:  Objection to
16       form.
17            THE WITNESS:  It happens
18       sometimes, yeah.
19   BY MR. SWIDLER:
20        Q.   Okay.
21        A.   I mean, there are -- I don't know.  I
22   have 100 employees.  Sometimes a guy doesn't
23   come to work.
24        Q.   You've testified during the union
25   proceedings that, in fact, you're generally not

42

1    there at 5:00 in the morning and that, because
2    people don't show up for work, it's Mr.
3    Morales' job to sort of figure out who needs to
4    replace those throwers who don't show up.  Is
5    that accurate, that it is Mr. Morales' job to
6    deal with an employee not showing up, a thrower
7    not showing up when he is supposed to come in
8    to work?
9         A.   Yes.
10        Q.   And Mr. Morales has testified that
11   the way he finds out when an employee didn't
12   show up for work is that employee either
13   doesn't come to Hammonton when the employee is
14   supposed to come to Hammonton or the employee
15   is not at their house when the employee is
16   supposed to be picked up.  Do you agree with
17   that?
18        A.   Sometimes.
19        Q.   That is how Mr. Morales can figure
20   out if somebody is absent, correct?
21        A.   Sometimes.  They also sometimes call
22   him and say they are not coming in or they're
23   not showing up.
24        Q.   But if an employee doesn't get on the
25   garbage truck -- and this is the almost exactly

43

1    what we asked Mr. Morales -- if an employee,
2    say, in Vineland doesn't get on the garbage
3    truck when he is supposed to and the garbage
4    truck is supposed to meet him at his house at a
5    specific time, that employee is marked as
6    absent.  Did you know that?
7             MS. TOMLJENOVIC:  Objection to
8        form.
9             THE WITNESS:  I don't know how
10       Mr. Morales does his own particular
11       notes to himself.  I only require
12       that I know who I have to pay at the
13       end of the week.
14   BY MR. SWIDLER:
15        Q.   If the employee is not at the exact
16   location where the garbage truck is to pick up
17   the employee at the time set in advance, the
18   employee is considered absent from work.  Did
19   you know that?  Do you agree with that?
20        A.   I don't know if I am going to agree
21   to a statement someone else made.
22        Q.   Let's forget it's a statement.  Do
23   you agree that an employee -- let's just use a
24   hypothetical name.  John Smith is getting
25   picked up from Vineland every day from his own

44

1    house to start working on the garbage route in
2    Vineland.  John Smith's pickup time is 5:30
3    a.m.  John Smith is not there at the pickup
4    time at 5:30 a.m.  Do you agree that the
5    employee is absent from work?
6         A.   Yes.
7         Q.   Okay.  So the pickup time is the time
8    the employee is required to report, correct?
9         A.   With this particular gentleman in
10   Vineland, yes.
11        Q.   So if there is a specific pickup
12   time, that is the reporting time, correct?
13        A.   For that individual, yes.
14        Q.   When would that individual's workday
15   start?
16        A.   When he started picking up garbage.
17        Q.   So after his reporting time?
18            MS. TOMLJENOVIC:  Objection to
19       form.
20            THE WITNESS:  I think I am not
21       going to speculate.
22   BY MR. SWIDLER:
23        Q.   His work time, in your position,
24   would be after his reporting time, correct?
25        A.   No.  His work time is sometime after

45

1   his -- no. Rephrase.  He starts work when he
2   starts picking up garbage, that's --
3      **Q.   So I just want to bring that to its**
4   **conclusion and we will move on.  Your position**
5   **is he starts work after he is required to**
6   **report on the garbage truck, correct?**
7      MS. TOMLJENOVIC:  Objection to
8   form.
9      THE WITNESS:  Or show up at his
10   spot where he's supposed to be.
11   BY MR. SWIDLER:
12      **Q.   In this particular employee, we have**
13   **established that he was supposed to report at a**
14   **specific time and if he is not there, he will**
15   **be marked absent.  So he is supposed to be at**
16   **the pickup location in this hypothetical**
17   **example.  But even for him, it's your position**
18   **that his workday wouldn't start until he**
19   **actually starts moving trash in the Vineland**
20   **residential route, correct?**
21      A.   Yes.
22      **Q.   So that would be after his reporting**
23   **time, correct?**
24      MS. TOMLJENOVIC:  Objection to
25   form.

46

1      THE WITNESS:  Yes.
2   BY MR. SWIDLER:
3      **Q.   Okay.  Before the GPS records, GPS**
4   **devices were installed on the trucks, South**
5   **Jersey certainly would not have had more**
6   **accurate records than the records would show**
7   **when 1A, 1B, and 1C regarding the time when the**
8   **trucks left the yard and came back to the yard,**
9   **correct?**
10      A.   Well, may I look at these?
11      **Q.   Oh, please.**
12      MS. TOMLJENOVIC:  You want --
13      MR. SWIDLER:  They have been
14   previously marked.  If Mr. Colasurdo
15   doesn't know what they are, since
16   they are his own business documents,
17   then I can discuss them further.  But
18   I will say for now, they were
19   previously marked as Morales 1A, 1B,
20   and 1C.
21      MS. TOMLJENOVIC:  For the
22   record, Morales 1C looks to be the
23   driver's time cards.  Morales 1B
24   looks to be the daily schedules
25   previously supplied by defendant.

47

1      And then Morales 1 --
2      MR. SWIDLER:  C -- that actually
3   would be 1A.  So it's just 1.
4      MS. TOMLJENOVIC:  Morales-1 is
5   just a single page and it looks to be
6   just the schedule marking how many
7   days that pay period someone worked.
8      MR. SWIDLER:  Right.
9      MS. TOMLJENOVIC:  Okay.
10   BY MR. SWIDLER:
11      **Q.   Now, prior to the GPS, these would be**
12   **the most accurate records South Jersey would**
13   **have regarding what time the truck drivers**
14   **worked, correct?**
15      A.   Yes.
16      **Q.   It would also be the most accurate**
17   **records South Jersey has regarding which**
18   **throwers work with which truck drivers,**
19   **correct?**
20      A.   Yes.
21      **Q.   And it would also be the most**
22   **accurate record showing which days of the week**
23   **the throwers worked, correct?**
24      A.   Yes.
25      **Q.   And prior to the GPS being installed**

48

1   **on the trucks, these would be the most accurate**
2   **records you would have regarding the -- I am**
3   **not saying they are exactly accurate, but it**
4   **would be the most accurate records you have**
5   **regarding the actual hours the throwers worked,**
6   **correct?**
7      MS. TOMLJENOVIC:  Objection to
8   form.  You can answer.
9      THE WITNESS:  Say that, again,
10   please.
11   BY MR. SWIDLER:
12      **Q.   I am going to rephrase it a little.**
13      **If one was trying to determine**
14   **how many hours the throwers worked, prior to**
15   **the GPS records being installed, these records**
16   **in front of you would be the most accurate**
17   **records available to us to try to determine how**
18   **many hours the throwers worked, correct?**
19      A.   Yes.
20      **Q.   And your position is, though, that**
21   **there is now GPS installed sometime over the**
22   **last year or so and those records may be more**
23   **accurate than these; is that fair?**
24      A.   Yes.
25      **Q.   And you now believe these GPS records**

49

1    may be the most accurate records you have
2    regarding the hours that the plaintiff in this
3    action worked, correct?
4           MS. TOMLJENOVIC: Objection to
5    form.
6           THE WITNESS: I do.
7           MR. SWIDLER: Again, we are
8    going to request these records.  Do
9    you intend to object to that request?
10           MS. TOMLJENOVIC: Yes.
11           MR. SWIDLER: Okay.
12           MS. TOMLJENOVIC: And also to
13    the three 30(b)6 depositions.
14           MR. SWIDLER: Okay.
15    BY MR. SWIDLER:
16       Q.  I'm going instruct you, and your
17    attorney will explain this to you later, that
18    whatever computer these files are saved on
19    needs to be preserved.  Needs to be preserved
20    as of today.  There are ways that -- and I know
21    that your attorney is familiar with it --
22    computers can be forensically copied, so to
23    ensure that no data is lost and ensure it is
24    all preserved properly.  I am going to instruct
25    you to do that.  It may involve you,

50

1    unfortunately, having to take the computer out
2    of business for a little while, just probably
3    for a few hours.  It may also require that you
4    change some internal preferences.  If you have
5    an IT person, you need to speak to that person
6    to ensure the data does not self delete.  Like
7    I say, your attorney will discuss this with
8    you, but I'm telling you this on the record
9    now.  And I do note it's 2:14 p.m. on Tuesday,
10    February 19th.
11           Based on the fact that, at least
12    until the GPS records were installed, the
13    records in front of you, which have been marked
14    1,1B,and 1C, are the most accurate records that
15    South Jersey has, you agree with me that even
16    these records do not tell you the exact amount
17    of hours any of the throwers worked, correct?
18       A.  Correct.
19       Q.  So you don't actually have any
20    records regarding the exact amount of hours the
21    throwers worked, at least up until a year ago
22    or so, when the GPS was installed, correct?
23           MS. TOMLJENOVIC: Objection to
24    form.  You can answer.
25           THE WITNESS: Yes.  Correct.

51

1    BY MR. SWIDLER:
2       Q.  Okay.  Now, according to your sworn
3    Interrogatory responses, the throwers were, in
4    essence, paid a daily rate and it was not
5    material how many hours they worked each day,
6    correct?
7       A.  Explain to me material.  I am not
8    sure.
9       Q.  It didn't change their compensation.
10       A.  Correct.
11       Q.  Okay.  And the way you explained this
12    in your Interrogatory is that it's based on
13    approximately 10 hours per day, calculated
14    would be in effect minimum wage and upon
15    assumption an employee will be paid for eight
16    hours at regular time minimum wage, two hours
17    at an overtime rate, which is one and a half
18    times the minimum wage, together with a daily
19    incentive.
20           Do you agree that that is how the
21    daily rate is calculated?
22       A.  Yes.  The 10 hours a day would be,
23    like, a maximum.  If a thrower worked six
24    hours, he would get the same rate.
25       Q.  What happens --

52

1       A.  That would be the part that would be
2    the incentive.  The incentive would change
3    based upon the hours.
4       Q.  But what happens if the thrower works
5    more than 10 hours?
6       A.  On a particular day?
7       Q.  On a particular day.
8       A.  If he worked six the next, he's paid
9    for -- you know, he's doing well.
10       Q.  Okay.  Let's say it's a strange week,
11    very busy, he works 10 hours every day.  Is it
12    your testimony that can never happen, nobody
13    could ever work 10 hours every day, five days
14    in a week, no thrower?
15           MS. TOMLJENOVIC: Objection to
16    form.
17           THE WITNESS: I am going to say
18    that they could.  In some instances,
19    guys are even compensated more, if
20    they do something extra.
21    BY MR. SWIDLER:
22       Q.  I am not saying extra.  I'm saying
23    they do exactly what they are supposed to do,
24    but the busy days mean they are working longer
25    hours.  How does your formula deal with that

---

53

1    situation?  Is that what the incentive is for?
2       A.   If a thrower were to work -- since
3    you said, not extra -- but if they were to work
4    longer days, then we would, in our opinion --
5    and you have payroll records that you've
6    subpoenaed of ours to see -- some guys got paid
7    extra money for particular days, because they
8    did work longer or do more.  I mean, those two
9    tend to go hand in hand.  If they work longer,
10    they do more.
11       Q.   When you say they get paid more, you
12    mean the daily rate would be increase?
13       A.   Some guys get extra incentive put on
14    their daily rate that particular day.
15       Q.   Who decides if that's going to
16    happen?
17       A.   Edwin, myself.
18       Q.   Is that discretionary?
19       A.   What does that mean?
20       Q.   In other words, do you have an
21    exclusive agreement with throwers that if they
22    work more than X hours they will get X extra
23    dollars added to their incentive, or is it a
24    discretionary amount?
25       A.   It's a discretionary amount.

---

54

1       Q.   So there is a guaranteed daily rate,
2    correct?
3       A.   Yes.
4       Q.   And that amount is guaranteed, if
5    they work a day they will make that much money,
6    regardless of the hours they work, correct?
7       A.   Yes.
8       Q.   But then there is a discretionary
9    amount that sometimes you or Mr. Morales adds
10    to that and that discretionary amount is just
11    basically because you recognize they worked
12    even longer might normally be required?
13       A.   That is one instance.  Another
14    instance would be, I want to keep them happy.
15    The next time we need them to do more, they
16    need to know that there is -- again, I use the
17    word, more, again and you're more interested in
18    time.  But the next time we need them to do
19    something that would require them to work
20    longer, they know they are going to make more
21    money.  And they always have the option of
22    requesting more based upon what they did.
23       Q.   How do you keep track if an employee
24    does more, other than through a discretionary
25    bonus?  Are there any records that would show

---

55

1    us the extra hours the employee worked?
2       A.   Since there are no record hours,
3    that, I cannot do.
4       Q.   Are there some occasions where
5    throwers come back to the Hammonton yard and
6    then on request get to do another assignment?
7       A.   Rephrase that.
8       Q.   Are there occasions where a thrower,
9    perhaps to get an incentive bonus, an extra
10    incentive bonus, returns to the Hammonton
11    yard at the end of the -- I don't want to call
12    it mornings, I know it goes to midafternoon --
13    but the first truck pickup, I am going to call
14    it the morning pickup, but we will both know
15    that the trucks may return after 12:00.
16       A.   I understand.
17       Q.   So the thrower comes back to the
18    Hammonton yard after that first route.  Are
19    there occasions where that thrower, either
20    because you need him or he requests it, gets to
21    go back out on another route?
22       A.   In the event that there are short
23    routes, we may have a thrower work another
24    route to complete a full day, yes.
25       Q.   Does South Jersey keep track of when

---

56

1    those occurrences happen?
2       A.   No.
3       Q.   And you don't know when those
4    occurrences have happened by memory, do you?
5       MS. TOMLJENOVIC:  Objection to
6    form.
7       THE WITNESS:  Not by memory.  I
8    will say, there are a couple of
9    routes that are just shorter in
10    nature and, when there's something
11    that might require a hour or
12    something, that's the first truck in
13    and they would go and get it.
14    BY MR. SWIDLER:
15       Q.   Which routes are shorter?
16       A.   They change.  There is seasonality.
17    There is -- there are a lot of variables into
18    the residential pickup.
19       Q.   I just asked you from memory and you
20    said, not from memory, but I could figure it
21    out, basically.  And I know I'm paraphrasing,
22    but that is essentially what you said.  I am
23    trying to see how I could figure it out.  What
24    routes would you look for to determine that
25    these are the routes that a thrower may have

57

1  been given an extra hour or two after he
2  completed the route?
3      A.  There is not a formula.  There is
4  not -- I don't have the word I want to use.  I
5  apologize.
6      Q.  That's all right.  Would there be
7  specific instances where I could ask you, did
8  this particular person work another route?  The
9  answer is, South Jersey wouldn't know, because
10  the records don't exist.  You would just sort
11  of know, maybe like in a court, on a
12  probabilistic framework, this route tends to be
13  shorter, so this person may have gone out
14  again; is that fair?
15      A.  That part would be fair.  And in the
16  event there is a short route and there is
17  another route that might need to be covered, we
18  may have scheduled a second helper or thrower
19  on that route, so that one man isn't doing more
20  than what one man should really do.
21      Q.  I understand.  But you don't have
22  records or recollection or really even the
23  ability now to look back over the last three or
24  four years and figure out on what specific
25  occasions which throwers worked two routes,

58

1  correct?
2          MS. TOMLJENOVIC:  Objection to
3      form.
4          THE WITNESS:  Not without
5      looking over every sheet and form.
6      And there will be some guesswork
7      involved.  That is the only way I can
8      answer your question.
9  BY MR. SWIDLER:
10      Q.  I think you answered it.  Okay.
11          Now, even though I understand
12  that it is your position that the throwers
13  don't work the entire time they are on the
14  truck, you still would agree that your formula
15  builds in the potential for them to work
16  overtime, correct?
17      A.  Say that again.
18      Q.  Your daily rate is based on an
19  assumption that they will work, in essence, 50
20  hours a week, correct?
21          MS. TOMLJENOVIC:  Objection to
22      form.
23          THE WITNESS:  The formula is
24      based that there are going to be a
25      certain number of hours that they

59

1      work.  It is also factored in that
2      there will be some overtime.  And a
3      guy who doesn't work any overtime but
4      works five days and they are all
5      short, he makes the same money.  He
6      makes -- if a man works faster than
7      someone else, so he works less hours,
8      I am not going to penalize him by
9      paying him less.
10  BY MR. SWIDLER:
11      Q.  But my question, in your mind, if you
12  learned and -- this is a hypothetical.  If you
13  learned that an employee, one of your throwers,
14  specifically, by the way you define the
15  workday, worked 45 hours in a week, that is
16  consistent with the amount they were paid for
17  that week, because they were paid, in essence,
18  for 10 hours each day.  So they were paid for
19  50 hours in the way you have calculated the
20  daily rate, correct?
21          MS. TOMLJENOVIC:  Objection to
22      form.
23          THE WITNESS:  Based upon your
24      hypothetical right there, I will say
25      yes.

60

1  BY MR. SWIDLER:
2      Q.  So if a thrower worked 45 hours in a
3  week and was paid a daily rate of $100 per day
4  and worked five days that week, your position
5  would be that he was paid and was paid overtime
6  for the five extra hours, correct?
7      A.  Yes.
8      Q.  And that's because, in essence, your
9  position is that he was paid minimum wage for
10  the first 40, time and a half for hours 40 to
11  45, and then an incentive to equal the
12  difference, because he was actually paid more
13  than minimum wage and time and a half and
14  minimum wage, correct?
15      A.  That is correct.
16      Q.  Do you understand whether the law,
17  the Fair Labor Standards Act, requires you to
18  pay some employees more than time and a half of
19  minimum wage for hours over 40?  Do you know if
20  it does?
21          MS. TOMLJENOVIC:  Objection to
22      form.
23          THE WITNESS:  Say that again,
24      please.
25  BY MR. SWIDLER:

61

1    Q.   Do you know whether the Fair Labor
2    Standards Act can require you to pay an
3    employee more than time and a half of minimum
4    wage for hours worked over 40 if the employee
5    earns more than minimum wage?  Do you know if
6    that is the case?
7          MS. TOMLJENOVIC:  Objection to
8    form.
9          THE WITNESS:  I don't know.
10   BY MR. SWIDLER:
11   Q.   Have you --
12   A.   And I will offer this to maybe speed
13   you along or help you get a sense of what we
14   do.
15         MS. TOMLJENOVIC:  There is no
16   question pending.  Let him just ask.
17         THE WITNESS:  I know.  I need to
18   do this, though.  We called the
19   Department of Labor and told them how
20   we compensate employees and we were
21   told, as long as it was minimum wage
22   and time and a half over 40, we would
23   be in compliance.
24   BY MR. SWIDLER:
25   Q.   Well, you were actually asked almost

62

1    that exact question by my law partner in your
2    last deposition.  You said that you were told
3    that a daily rate was an okay way to pay
4    employees.  But you testified that you didn't
5    tell the DOL that the employees worked more
6    than 40 hours a week.  So I just want to be
7    clear.  Is it your testimony that you told
8    DOL that the throwers worked more than 40 hours
9    per week?
10         MS. TOMLJENOVIC:  Objection to
11   form.  You can answer.
12         THE WITNESS:  I maybe didn't say
13   it, but I think I did.  But that's
14   how we do it, regardless of what the
15   court reporter put down or I didn't
16   say, but that's how it's done.
17   BY MR. SWIDLER:
18   Q.   I am not asking how it's done.
19   A.   If that is how I said it and that's
20   how it was said.
21   Q.   Which Department of Labor did you
22   call?
23   A.   I didn't make the call myself.
24   Q.   Who did?
25   A.   My accountant.

63

1    Q.   Who is your accountant?
2    A.   Richard Malesich.
3    Q.   You don't actually know if Richard
4    asked if a daily rate was okay or if he asked
5    if time and a half over 40 at minimum wage was
6    okay, because you didn't make the call,
7    correct?
8          MS. TOMLJENOVIC:  Objection
9    form.
10         THE WITNESS:  I don't recall
11   exactly what he said.
12   BY MR. SWIDLER:
13   Q.   It wasn't, like, on speakerphone and
14   you were in the room?  You heard of this phone
15   call through Richard telling you after the
16   fact, correct?
17   A.   Correct.
18   Q.   I don't mean with respect to this
19   litigation and I certainly don't mean with
20   respect to any allegations made in this
21   lawsuit, but prior to this lawsuit having been
22   filed, did you ever consult with any legal
23   expert, attorney, or any other person regarding
24   the pay practices of South Jersey Sanitation?
25         MS. TOMLJENOVIC:  Objection to

64

1    form.  That is privileged.
2          MR. SWIDLER:  It probably is.
3    Let me rephrase it.
4    BY MR. SWIDLER:
5    Q.   When creating and implementing your
6    wage and hour policies with respect to the
7    throwers and your daily rate, did you consult
8    with any attorneys?
9          MS. TOMLJENOVIC:  You can say
10   whether you consulted, but you can't
11   say anything that was said or
12   discussed with any attorney.
13         THE WITNESS:  I don't remember.
14   BY MR. SWIDLER:
15   Q.   Did you do any of your own
16   independent research on the Internet or,
17   really, any way you might do research, to
18   determine if your wage and hour policies were
19   compliant with the law?
20         MS. TOMLJENOVIC:  At any point
21   in time?
22         MR. SWIDLER:  Yes.  Now I am
23   going to say at any point in time.
24   BY MR. SWIDLER:
25   Q.   And this probably goes without

65

1    saying. I am not asking about discussions you
2    had with counsel, especially in regards to this
3    lawsuit. I just want to know, in your own
4    independent accord, did you ever try to do your
5    own research?
6         MS. TOMLJENOVIC: Objection to
7    form. But answer, if you can.
8         THE WITNESS: I don't remember.
9    BY MR. SWIDLER:
10    Q.   Okay.
11    A.   The reason being, it's been a long
12    time. I have been in business a long time. I
13    don't know what I might have did ten years ago
14    or five years ago.
15    Q.   How long has this policy been in
16    effect, this sort of daily rate with the -- can
17    I call it a split day? You have eight hours
18    and two hours of overtime. Can I call it,
19    like, a split day policy?
20         MS. TOMLJENOVIC: Objection to
21    form.
22         THE WITNESS: I don't think
23    that's fair. I think a day rate is
24    probably -- is what I call it.
25    BY MR. SWIDLER:

66

1    Q.   If it's just a day rate, is any money
2    paid for overtime compensation in that day
3    rate?
4    A.   It's built into the overall
5    compensation.
6    Q.   Okay. It's built in, because two
7    hours is considered overtime, correct?
8         MS. TOMLJENOVIC: Objection to
9    form.
10         THE WITNESS: At least two
11    hours, yeah. I mean, there is a --
12    there is a standard to pay employees
13    a certain dollar figure for them to
14    work, for them to do a job, to make
15    it favorable for them to work for me
16    as opposed to a construction job or a
17    landscaper or for another garbage
18    company. It's really how we come up
19    with it. To say that it was minimum
20    wage, minimum wage times eight hours
21    a day is not any money. It's $56, I
22    think. I pay them much more than
23    that. There's a lot overtime into
24    that eight-hour day that I just
25    described. But if a guy works eight

67

1    hours for me, he is still getting
2    much more than $56.
3    BY MR. SWIDLER:
4    Q.   I will represent to you -- you can
5    just take this as true, because when I say I
6    represent to you, it doesn't mean you have to
7    agree with me. It means, for the purposes of
8    answering the question, I want you to assume
9    this is true.
10    A.   Okay.
11    Q.   If you paid somebody a daily rate and
12    you didn't distinguish between overtime and
13    regular time, you didn't do any of that, and
14    that person worked for you 60 hours a week and
15    you paid them for five days, so they worked 12
16    hours a day, and the person is nonexempt, you
17    would owe that person overtime. Okay? So my
18    understanding as to the way -- one of the
19    positions of South Jersey is that, one of the
20    reasons they don't owe overtime to the clients
21    is because they already paid overtime, it's
22    included in the daily rate. Is that an
23    accurate understanding?
24         MS. TOMLJENOVIC: Objection to
25    form.

68

1    BY MR. SWIDLER:
2    Q.   The last part, is it accurate that
3    one of your positions is you have already paid
4    the plaintiffs in this case overtime because
5    the daily rate includes it?
6    A.   The daily rate does include a certain
7    number of overtime hours, based upon whether
8    they have it or not, whether they have the
9    overtime hours or not, they still get
10    compensated.
11    Q.   So, in a sense, it splits the day
12    between eight hours of regular and two hours of
13    overtime; is that fair?
14         MS. TOMLJENOVIC: Objection to
15    form.
16         THE WITNESS: It's not really
17    fair, because they get paid overtime
18    based on a 40-hour week.
19    BY MR. SWIDLER:
20    Q.   Right.
21    A.   It's not overtime after eight hours.
22    Q.   Well, most throwers -- I know there
23    are exceptions, but even I recognize, most of
24    the throwers are working five days a week, not
25    six, correct?

69

1      A.   I wouldn't even say that most of them
2  work five.  But there is some number that work
3  five, let's put it that way.  Some work less
4  than five.
5      Q.   It's rare that they work six?
6      A.   Right.
7      Q.   We have seen the records.  I
8  understand that.  It's rare they work six.  You
9  agree with that?
10     A.   Yes.
11     Q.   It's not as rare that they would work
12 five days per week, correct?
13     A.   Not as rare as six, correct.
14     Q.   If they worked five days and they
15 worked less than 50 hours, the position of
16 South Jersey is they have already been paid for
17 any overtime they may have worked, because,
18 when they work five days at the daily rate,
19 they are already being paid in essence for 10
20 overtime hours for that week, whether they work
21 them or not?
22     A.   Yes.
23          MS. TOMLJENOVIC:  Objection.
24 BY MR. SWIDLER:
25     Q.   How do you calculate what the

70

1  incentive amount is each week?  I don't need
2  the discretionary part.  Again, this is your
3  Interrogatory.  They get paid eight hours of
4  regular time, which is minimum wage, two hours
5  as an overtime rate, which is one and a half
6  times the minimum, together with a daily
7  incentive amount.  How do you calculate that
8  daily incentive amount?
9      A.   It's actually a float.  It's not the
10 same.  That incentive amount, whatever that
11 number is, changes by the base of whatever the
12 baseline was of the hours that they worked to
13 begin with.  If a man worked four days, he
14 still is getting that built-in overtime, so
15 therefore, his incentive rate would be higher.
16     Q.   So in other words, the incentive rate
17 is sort of -- it's like an X to get you to the
18 final number --
19     A.   We back to a formula to give that
20 worker that dollar figure, correct.
21     Q.   But the formula starts with the
22 dollar figure that they are going to earn and
23 then it works backwards to describe how it got
24 there; is that accurate?
25          MS. TOMLJENOVIC:  Objection to

71

1  form.
2          THE WITNESS:  I am not sure
3  which came first, as I go back in my
4  brain, the chicken or the egg,
5  Justin.  But it was a methodology
6  used to fairly compensate, in my
7  head, to fairly compensate and to
8  make those workers work for South
9  Jersey Sanitation and not someone
10 else.
11 BY MR. SWIDLER:
12     Q.   Right.  I understand the purpose of
13 it.  But --
14     A.   If you work one day, Justin, you got
15 paid the day rate, the $100 rate.  You had no
16 overtime, but you still got -- so the
17 calculation is different.  There are guys that
18 only want to work a couple of days a week and
19 they are happy with that.  I don't understand.
20     Q.   Rather than ask you how it first
21 started ten or more years ago, these days, like
22 recently, when you calculate a person's pay,
23 you start with how many days per week did they
24 work, right, you multiply that by the daily
25 rate, and then, when sort of breaking it down,

72

1  you add to that, well, this is really based on
2  minimum wage, time and a half, and an incentive
3  amount, but the total compensation starts with
4  number of days times the daily rate, correct?
5          MS. TOMLJENOVIC:  Objection to
6  form.
7          THE WITNESS:  Yes.  If I have to
8  explain how we got there, that's how
9  we got there.
10 BY MR. SWIDLER:
11     Q.   By way of example, if I asked you
12 hypothetically that, let's say John Smith
13 worked 42 hours for your company over the
14 course of a week and his daily rate was $100,
15 that wouldn't be enough, still, for you to
16 calculate how much he was earning, correct,
17 because you don't have the amount of days that
18 he worked, which is a requirement to figure out
19 how much you owe him, correct?
20          MS. TOMLJENOVIC:  Object to the
21 form.
22          THE WITNESS:  No.  I disagree.
23 I have the number of days he worked.
24 BY MR. SWIDLER:
25     Q.   I am just trying to figure out how

73

1   the formula works.  The only two pieces of
2   information that you require to determine how
3   much you owe an employee is number of days
4   worked during the week and the daily rate?
5   Those are the only two pieces of information
6   you need, correct?
7        MS. TOMLJENOVIC:  Objection to
8        form.
9        THE WITNESS:  Yes.
10  BY MR. SWIDLER:
11       Q.   Number of hours and incentive rate,
12  that is just there to sort of justify the
13  number that is already determined by the daily
14  rate and the number of days worked, correct?
15       MS. TOMLJENOVIC:  Objection to
16       form.
17       THE WITNESS:  I am going to
18       disagree with the way you're phrasing
19       it.
20  BY MR. SWIDLER:
21       Q.   How would you phrase it?
22       A.   It was designed to fairly compensate
23  an employee.
24       Q.   I know.  I am not asking about
25  whether it's fair, whether you're paying more

74

1   than the minimum wage.  My question is, if you
2   have to figure out a person's compensation,
3   you've already answered, there is only two
4   things you need, number of days worked and the
5   daily rate.  You multiple those together, that
6   is how much you owe the person for the week,
7   correct?
8        A.   Right.
9        MS. TOMLJENOVIC:  Objection to
10       form.
11  BY MR. SWIDLER:
12       Q.   And this explanation about that they
13  are really paid for ten hours, eight of which
14  is regular, two of which is overtime, and then
15  an incentive amount, that's after the fact?
16  You have already decided how much they're
17  earning, correct?
18       MS. TOMLJENOVIC:  Objection to
19       form.
20       THE WITNESS:  I can't answer
21       that question that way.  It's not a
22       fair presentation --
23  BY MR. SWIDLER:
24       Q.   Just tell me how you would phrase it.
25       MS. TOMLJENOVIC:  What is the

75

1   question.  What do you want
2   rephrased?
3   BY MR. SWIDLER:
4        Q.   The question is, whether these
5   variables of regular hours worked, overtime
6   hours, and incentive, if that really helps you
7   calculate the wages or if the only thing you're
8   really looking at is daily rate and days
9   worked?
10       MS. TOMLJENOVIC:  Are you
11       talking about per week, per person?
12       MR. SWIDLER:  Yes.
13       MS. TOMLJENOVIC:  I object to
14       form.  Mischaracterizes his earlier
15       testimony.
16  BY MR. SWIDLER:
17       Q.   I have given you the opportunity to
18  answer however you think is best.  I am not
19  trying to mischaracterize your testimony.
20       A.   I am just trying to figure the best
21  way to explain it to you so we can move on.  I
22  know I wasn't keeping hourly records for the
23  helpers, throwers.  And in order to compensate
24  them so that it was fair, we did make the phone
25  call to the Department of Labor.  And my

76

1   formula, the way I came up with this years ago,
2   was that they have a minimum wage and they had
3   an incentive on top of that so they would work
4   to get -- so it was fair, so a man would work
5   for me.  To work out the numbers as to what is
6   overtime, it was difficult, because not
7   everyone works a certain -- there is not a set
8   time.  But I knew it would be okay if I
9   overcompensated them, because that's not a
10  problem.  There still wasn't a record kept and
11  that was a problem.  And I have to figure out a
12  way to correct that and I will get there.  But
13  that is how I came up with it.  I can't answer
14  it any other way.
15       Q.   You understand now that you need to
16  keep hourly records for the throwers?  Sitting
17  here today, you understand that?
18       MS. TOMLJENOVIC:  Objection to
19       form.
20       THE WITNESS:  I understand that
21       if I did that we wouldn't be having
22       this discussion.  I also understand
23       that my helpers don't want to be paid
24       hourly, the majority of them.  You
25       have deposed several of them.  They

77

1    know that this is an issue.  Word is
2    that they don't want this, the
3    majority of my helpers, because they
4    recognize that they are not going to
5    make any money in most of the year if
6    I paid them straight hourly wage.
7  BY MR. SWIDLER:
8    Q.   I suppose it would depend what their
9  hourly rate was.
10   A.   If it was minimum wage.
11   Q.   Well, I agreed you paid them more
12 than minimum wage.  For the most part, there is
13 no allegation in this lawsuit that you paid
14 under minimum wage, except maybe for a few
15 weeks.
16       Let me ask you this, even if we
17 use your definition of when the workday starts
18 and when the workday ends -- I actually didn't
19 ask you when the workday ends.  We didn't
20 actually go there.  When does the workday end,
21 in your mind, for a thrower?
22   A.   When they have completed their last
23 pickup of the day.
24   Q.   So the final residence?
25   A.   Yes.

78

1    Q.   So the way you define the workday, it
2  starts at the very first residence that they
3  pick up trash in and ends at the very final
4  residence that they pick up trash in; is that
5  fair?
6    A.   Yes.
7    Q.   Even using that definition, there are
8  still weeks where some throwers will work more
9  than 40 hours, correct?
10       MS. TOMLJENOVIC:  Objection to
11 form.
12       THE WITNESS:  More than 40
13 hours?  Yes.
14 BY MR. SWIDLER:
15   Q.   And your formula, again, is designed
16 to pay them for that, correct?
17   A.   And pay them for the 40 and beyond.
18   Q.   Not to be repetitive, but you don't
19 have accurate records showing you which weeks
20 to which throwers that would have occurred for,
21 other than maybe the GPS records, maybe?
22       MS. TOMLJENOVIC:  Objection to
23 form.
24       THE WITNESS:  Justin, if you
25 worked for me as a thrower, there is

79

1    not a record that says, Justin,
2    Hours, correct.
3        MR. SWIDLER:  Okay.
4        - - -
5    (Whereupon, a recess was held from
6    2:43 p.m. to 2:48 p.m.)
7        - - -
8  BY MR. SWIDLER:
9    Q.   Is Mr. Malesich still your
10 accountant?
11   A.   Yes.
12   Q.   And how long has he been your
13 accountant?
14   A.   Over 10 years.
15   Q.   And I think you answered this.  When
16 I say, your, I mean South Jersey's accountant.
17   A.   Correct.
18   Q.   He has been South Jersey's
19 accountant?
20   A.   Yes.
21   Q.   And he has been South Jersey's
22 accountant for more than 10 years?
23   A.   Yes.
24   Q.   Did he ever raise concerns with you
25 regarding the way you pay your employees?

80

1    A.   We talk about many things.  I don't
2  recall.
3    Q.   I mean, you just don't recall him
4  ever telling you whether he thinks the way you
5  compensate the employees is legal or not?
6        MS. TOMLJENOVIC:  Objection to
7  form.
8        THE WITNESS:  I don't recall
9    what he may have said to me.  I'm not
10   going to answer that question that
11   way.
12 BY MR. SWIDLER:
13   Q.   You don't remember?  It's not that
14 you are not going to answer?  You don't
15 remember?
16   A.   Correct.
17       MR. SWIDLER:  So I understand,
18   you're objecting to the production of
19   GPS records?
20       MS. TOMLJENOVIC:  Yes, at this
21   time, if you don't put something in
22   writing specifically.
23       MR. SWIDLER:  We don't have
24   time.  I think discovery is in two
25   days.

81

1           MS. TOMLJENOVIC:  Off the
2   record.
3           (Off the record)
4           MR. SWIDLER:  The deposition is
5   over unless -- do you have anything
6   you want to ask?
7           MS. TOMLJENOVIC:  No.
8           MR. SWIDLER:  You're done.
9               - - -
10      (Witness excused.)
11              - - -
12      (Deposition concluded.  Time noted
13   2:53 p.m.)
14              - - -
15
16
17
18
19
20
21
22
23
24
25

82

1               - - -
2          C E R T I F I C A T I O N
3               - - -
4
5       I hereby certify that the proceedings and
6   evidence are contained fully and accurately in
7   the stenographic notes taken by me upon the
8   foregoing matter on February 19, 2013, and that
9   this is a correct transcript of same.
10
11
12       _____
13             KIMBERLY A. LITTLE, RPR, CCR
              NOTARY PUBLIC
14
15
16
17       (The foregoing certification of
18   this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying
22   shorthand reporter.)
23
24
25

ANTHONY COLASURDO

83

**A**

**ability** 32:15
  57:23
**able** 12:4,14
**absent** 42:20
  43:6,18 44:5
  45:15
**absolutely** 22:11
**accord** 65:4
**accountant**
  62:25 63:1
  79:10,13,16,19
  79:22
**accurate** 8:15
  19:9 24:2,4
  34:22 40:17,25
  42:5 46:6
  47:12,16,22
  48:1,3,4,16,23
  49:1 50:14
  67:23 68:2
  70:24 78:19
**accurately** 82:6
**act** 60:17 61:2
**action** 1:4 49:3
**activities** 15:5
**activity** 36:12
**actual** 48:5
**add** 18:13 72:1
**added** 53:23
**adds** 54:9
**advance** 43:17
**ago** 18:8 24:23
  29:13 50:21
  65:13,14 71:21
  76:1
**agree** 16:2,6,8
  41:10,14 42:16
  43:19,20,23
  44:4 50:15
  51:20 58:14
  67:7 69:9
**agreed** 4:4 77:11
**agreement** 53:21
**ahead** 20:14

**alavezlopez** 1:4
**alejandro** 1:5
**allegation** 77:13
**allegations** 63:20
**allegedly** 19:9
**allow** 36:3
**allowed** 29:6
  31:11 32:17
  36:13
**alyson** 2:9
**amount** 14:15
  30:20 50:16,20
  53:24,25 54:4
  54:9,10 59:16
  70:1,7,8,10
  72:3,17 74:15
**answer** 5:20,23
  6:3,14,21 9:8
  9:13,19 10:13
  10:24 11:5
  12:8,17,19,22
  13:12,19,25
  15:6 21:3
  22:15 24:6
  27:5,13,19
  30:7 32:13
  33:8,21 34:4
  36:9 38:5,15
  39:9,22 48:8
  50:24 57:9
  58:8 62:11
  65:7 74:20
  75:18 76:13
  80:10,14
**answered** 11:20
  24:8 34:7
  58:10 74:3
  79:15
**answering** 6:13
  67:8
**anthony** 1:10,16
  3:2 4:12,22,24
  4:25 5:4
**antonio** 1:4,5,6
**anybody** 23:1

**apologize** 57:5
**appearances** 2:1
**apply** 82:18
**approximately**
  1:17 14:6
  24:25 51:13
**april** 2:8
**area** 38:11
**argue** 32:20
**arguing** 32:22
**arrive** 16:5 37:3
**arrived** 37:15
**arrives** 41:5
**arriving** 38:8
**asked** 5:24 18:25
  24:1,9 27:14
  27:17,24 28:19
  33:4 43:1
  56:19 61:25
  63:4,4 72:11
**asking** 10:25
  13:4,8,11
  24:21 28:8
  29:17,18 30:14
  30:17,19 62:18
  65:1 73:24
**assignment** 55:6
**assume** 6:4,4
  10:24 67:8
**assumption**
  51:15 58:19
**atlantic** 2:9,10
**atomljenovic**
  2:11
**attorney** 5:11
  11:19 19:17
  20:1 22:9
  31:17 49:17,21
  50:7 63:23
  64:12
**attorneys** 64:8
**available** 48:17
**avenue** 2:7
**average** 13:15
  14:15

**aware** 18:24
  19:4

**B**

**b** 3:8 19:22
  49:13
**back** 18:21
  19:20,21 20:17
  27:2 29:23
  33:17 37:11
  38:3 46:8 55:5
  55:17,21 57:23
  70:19 71:3
**backwards**
  70:23
**badgered** 22:7
  29:4 33:10
**badgering** 32:12
**badliacco** 22:23
  23:4,15
**bargaining**
  36:21,22
**base** 70:11
**based** 16:6 19:23
  35:9 50:11
  51:12 52:3
  54:22 58:18,24
  59:23 68:7,18
  72:1
**baseline** 70:12
**basically** 54:11
  56:21
**bauer** 23:2,5,16
**behalf** 1:6
**behavior** 22:10
**believe** 24:9
  27:16 48:25
**best** 32:15 38:16
  75:18,20
**better** 16:3,10
  24:3 28:2 39:2
**beyond** 78:17
**board** 36:14
**bonus** 54:25
  55:9,10

**box** 1:23
**brain** 71:4
**break** 7:2,4
**breaking** 71:25
**briefly** 5:2
**bring** 45:3
**broke** 7:15
**brought** 36:11
**builds** 58:15
**built** 66:4,6
**builtin** 70:14
**bus** 39:17
**busier** 35:19
**business** 7:16
  46:16 50:2
  65:12
**businesses** 7:7
**busy** 52:11,24

**C**

**c** 2:8 47:2 82:2,2
**calculate** 69:25
  70:7 71:22
  72:16 75:7
**calculated** 51:13
  51:21 59:19
**calculation**
  71:17
**calendar** 27:3
**call** 5:3,4 19:20
  19:21,22 20:12
  20:15 31:8,15
  32:24 34:14,15
  36:19 42:21
  55:11,13 62:22
  62:23 63:6,15
  65:17,18,24
  75:25
**called** 61:18
**calling** 22:12
  34:12
**cameras** 16:23
**campaign** 35:1
**cant** 9:8,18,18
  10:13 11:5,8

12:18 13:25
15:6 18:14
29:12,15 30:7
30:23,25 31:18
33:21,22 64:10
74:20 76:13
**car** 10:23
**card** 36:7
**cards** 46:23
**case** 5:10 61:6
68:4
**cases** 39:15,15
**ccr** 82:13
**certain** 17:2
21:10 35:19
58:25 66:13
68:6 76:7
**certainly** 16:3
30:21 46:5
63:19
**certification** 4:7
82:17
**certified** 1:18
**certify** 82:5
**certifying** 82:21
**change** 13:4
36:14 50:4
51:9 52:2
56:16
**changes** 70:11
**changing** 29:7
**check** 20:23
24:13
**cherry** 1:17 2:4
12:25 39:23
40:1
**chicken** 71:4
**choose** 10:11
16:21 17:13,15
**chosen** 35:24
**city** 2:10
**civil** 1:4
**clarified** 27:21
**clear** 5:13 62:7
**clients** 67:20

**clock** 36:6
**close** 8:14 40:8
**colarsurdo** 1:10
**colasurdo** 1:16
3:2 4:12,22,23
7:7 46:14
**com** 2:11
**come** 35:15 36:1
36:4 41:23
42:7,13,14
55:5 66:18
**comes** 29:14
55:17
**coming** 36:12
42:22
**commensurate**
35:13
**commercial** 26:3
**common** 41:10
41:14
**commonwealth**
1:19
**companies** 7:25
**company** 1:10
7:9,22 8:6
12:24 66:18
72:13
**compensate**
61:20 71:6,7
73:22 75:23
80:5
**compensated**
52:19 68:10
**compensating**
35:8
**compensation**
51:9 66:2,5
72:3 74:2
**complaint** 22:8
**complete** 55:24
**completed** 57:2
77:22
**compliance**
61:23
**compliant** 64:19

**computer** 17:14
17:17 20:24
49:18 50:1
**computers** 49:22
**concerns** 79:24
**concluded** 81:12
**conclusion** 45:4
**consider** 15:24
37:16
**considered**
43:18 66:7
**consistent** 9:14
11:4 15:4,10
59:16
**constantino** 1:5
**construction**
66:16
**consult** 63:22
64:7
**consulted** 64:10
**contact** 19:23
**contained** 82:6
**control** 82:20
**cooper** 2:8
**cooperlevenson**
2:11
**coordinates**
21:17 23:20
**copied** 49:22
**correct** 8:22 9:1
9:5,14 10:6,10
16:5 17:7,21
18:18,22 20:21
23:13,17,21
36:25 39:14,18
40:14 42:20
44:8,12,24
45:6,20,23
46:9 47:14,19
47:23 48:6,18
49:3 50:17,18
50:22,25 51:6
51:10 54:2,6
58:1,16,20
59:20 60:6,14

60:15 63:7,16
63:17 66:7
68:25 69:12,13
70:20 72:4,16
72:19 73:6,14
74:7,17 76:12
78:9,16 79:2
79:17 80:16
82:9
**counsel** 4:5 65:2
**couple** 18:13
56:8 71:18
**course** 72:14
**court** 1:1,19,22
6:9 19:23
57:11 62:15
**covered** 57:17
**creating** 64:5
**credible** 30:24
33:19
**currently** 7:8
**customers** 26:3
**cut** 6:18

___

**D**

**d** 3:1
**daily** 46:24 51:4
51:18,21 53:12
53:14 54:1
58:18 59:20
60:3 62:3 63:4
64:7 65:16
67:11,22 68:5
68:6 69:18
70:6,8 71:24
72:4,14 73:4
73:13 74:5
75:8
**dark** 5:21
**data** 25:11,14
26:7,10,13,21
29:21 30:21
32:19 34:3
49:23 50:6
**date** 1:17 18:15

21:11
**day** 8:8,10,11,12
8:18,21,24
10:7,9 11:4,25
12:5,15,20
13:4,10 17:9
18:21 25:17,18
37:2,5,25
38:25 39:4,5,7
43:25 51:5,13
51:22 52:6,7
52:11,13 53:14
54:5 55:24
59:18 60:3
65:17,19,23
66:1,2,21,24
67:16 68:11
71:14,15 77:23
**days** 9:21 10:3
35:18 47:7,22
52:13,24 53:4
53:7 59:4 60:4
67:15 68:24
69:12,14,18
70:13 71:18,21
71:23 72:4,17
72:23 73:3,14
74:4 75:8
80:25
**deadline** 19:24
**deal** 42:6 52:25
**decent** 35:16
**decided** 74:16
**decides** 53:15
**defendant** 46:25
**defendants** 1:11
2:12
**define** 40:19
59:14 78:1
**definition** 77:17
78:7
**definitive** 12:19
12:22
**delete** 50:6
**dep** 20:7

ANTHONY COLASURDO

**department**
61:19 62:21
75:25
**depend** 77:8
**deposed** 29:13
76:25
**deposition** 1:16
5:9 19:22
22:13 23:11
29:10 31:19
34:25 62:19
81:4,12
**depositions** 13:1
49:13
**derossi** 22:25
23:5,16
**describe** 70:23
**described** 66:25
**description** 3:9
**designed** 73:22
78:15
**designee** 5:10
7:1
**determine** 16:20
48:13,17 56:24
64:18 73:2
**determined**
73:13
**devices** 46:4
**didnt** 5:17 19:12
21:24 23:7
28:22 29:9
33:18 42:11
51:9 62:4,12
62:15,23 63:6
67:12,13 77:18
77:19
**difference** 60:12
**different** 8:11,13
15:12 71:17
**difficult** 76:6
**dina** 22:23
**direct** 82:20
**disagree** 72:22
73:18

**discovery** 80:24
**discretionary**
53:18,24,25
54:8,10,24
70:2
**discuss** 46:17
50:7
**discussed** 64:12
**discussion** 76:22
**discussions** 65:1
**distance** 37:21
**distinguish**
67:12
**district** 1:1,2
**document** 3:14
**documents**
34:10 46:16
**doesnt** 14:4 33:5
33:7,13,14
39:4 41:22
42:13,24 43:2
46:15 59:3
67:6
**doing** 26:4 29:8
29:9 36:14
41:3 52:9
57:19
**dol** 62:5,8
**dollar** 66:13
70:20,22
**dollars** 53:23
**dont** 5:21,22,23
6:8,24 10:24
11:2,3,4,9,15
11:23 12:22
13:13,24 15:7
17:5,9,15
19:18 20:6
21:1 25:1,9
26:18 30:2
33:25 36:1
38:12 39:10
40:12 41:8,9
41:21 42:2,4
43:9,20 50:19

55:11 56:3
57:4,10,21
58:13 61:9
63:3,10,18,19
64:13 65:8,13
65:22 67:20
70:1 71:19
72:17 76:23
77:2 78:18
80:1,3,8,13,14
80:21,23
**drive** 10:23
**driver** 25:22
**drivers** 15:22
19:6 25:21
39:2 46:23
47:13,18
**driving** 40:13
**duly** 4:13

**E**
**e** 3:1,8 82:2
**earlier** 5:12 7:1
11:7 24:1
34:19 75:14
**earn** 70:22
**earning** 72:16
74:17
**earns** 61:5
**edwin** 15:20
16:2 21:9
53:17
**effect** 51:14
65:16
**egg** 71:4
**eight** 51:15
65:17 66:20,25
68:12,21 70:3
74:13
**eighthour** 66:24
**either** 5:17,22
42:12 55:19
**employee** 42:6
42:11,12,13,14
42:15,24 43:1

43:5,15,17,18
43:23 44:5,8
45:12 51:15
54:23 55:1
59:13 61:3,4
73:3,23
**employees** 41:8
41:22 60:18
61:20 62:4,5
66:12 79:25
80:5
**employment**
7:24
**ends** 77:18,19
78:3
**ensure** 49:23,23
50:6
**entire** 58:13
**equal** 60:11
**especially** 65:2
**esquire** 2:2,9
**essence** 51:4
58:19 59:17
60:8 69:19
**essentially** 56:22
**established**
45:13
**estate** 7:22 8:3
**estimate** 31:12
**estimates** 32:17
**estimating** 20:20
**event** 55:22
57:16
**evidence** 82:6
**exact** 18:15,17
18:20 40:18
43:15 50:16,20
62:1
**exactly** 32:6
42:25 48:3
52:23 63:11
**examination** 3:3
**examined** 4:13
**example** 45:17
72:11

**exceptions** 68:23
**exclusive** 53:21
**excuse** 23:12
**excused** 81:10
**exist** 57:10
**exit** 38:7,10
**expect** 6:24
13:13 19:24
**experiences** 11:1
**expert** 63:23
**explain** 32:2,5
49:17 51:7
72:8 75:21
**explained** 51:11
**explanation**
74:12
**extra** 52:20,22
53:3,7,13,22
55:1,9 57:1
60:6

**F**
**f** 82:2
**facility** 8:16 36:2
**fact** 29:8 41:25
50:11 63:16
74:15
**factored** 59:1
**fair** 6:5 9:21
10:4 48:23
57:14,15 60:17
61:1 65:23
68:13,17 73:25
74:22 75:24
76:4 78:5
**fairly** 24:8 35:8
71:6,7 73:22
**familiar** 49:21
**family** 35:21
**faster** 59:6
**favorable** 66:15
**fax** 1:24
**february** 1:13
14:23,24 25:16
25:17 35:15,17

ANTHONY COLASURDO

50:10 82:8
**feed** 35:21
**feel** 22:6 24:19
  29:3
**figure** 29:6 42:3
  42:19 56:20,23
  57:24 66:13
  70:20,22 72:18
  72:25 74:2
  75:20 76:11
**filed** 63:22
**files** 49:18
**filing** 4:6
**final** 70:18 77:24
  78:3
**finally** 6:24
**finds** 42:11
**fine** 5:6 29:20
**finish** 6:12,14,21
**firm** 36:11
**first** 5:14 11:24
  28:19,23 37:3
  37:15,24 38:9
  38:24 39:6
  40:20 55:13,18
  56:12 60:10
  71:3,20 78:2
**five** 13:9 25:4
  26:20 27:9,10
  27:18 52:13
  59:4 60:4,6
  65:14 67:15
  68:24 69:2,3,4
  69:12,14,18
**float** 70:9
**follows** 4:14
**foregoing** 82:8
  82:17
**forensically**
  49:22
**forget** 43:22
**forgot** 36:19
**form** 4:9 12:2,7
  12:17 16:7,13
  17:24 24:6

28:5 30:6
37:18 39:9
40:5 41:16
43:8 44:19
45:8,25 48:8
49:5 50:24
52:16 56:6
58:3,5,22
59:22 60:22
61:8 62:11
63:9 64:1 65:7
65:21 66:9
67:25 68:15
71:1 72:6,21
73:8,16 74:10
74:19 75:14
76:19 78:11,23
80:7
**formula** 52:25
  57:3 58:14,23
  70:19,21 73:1
  76:1 78:15
**four** 15:3 23:16
  23:21 57:24
  70:13
**frame** 28:7
**framework**
  57:12
**friend** 23:11
**front** 7:4 25:25
  48:16 50:13
**full** 55:24
**fully** 82:6
**further** 36:9
  46:17

───────
**G**
**garbage** 39:13
  39:17 40:13,13
  42:25 43:2,3
  43:16 44:1,16
  45:2,6 66:17
**general** 15:5
**generally** 10:5
  41:25

**gentleman** 44:9
**getting** 40:12
  43:24 67:1
  70:14
**give** 9:12,16 11:9
  12:18 30:3,18
  30:21 31:2
  34:4 70:19
**given** 57:1 75:17
**glenn** 25:23
**go** 4:23 5:7,12
  7:4,20 10:6
  11:12 20:14
  21:8,15 26:1
  29:23 33:16
  37:11 38:19
  53:9 55:21
  56:13 71:3
  77:20
**goes** 55:12 64:25
**going** 5:4,7,12
  6:4 7:20 9:22
  12:9 16:14
  19:22 20:12,17
  22:2 27:2,15
  28:25 31:15
  32:6,9,20 34:9
  34:14 36:5
  41:6 43:20
  44:21 48:12
  49:8,16,24
  52:17 53:15
  54:20 55:13
  58:24 59:8
  64:23 70:22
  73:17 77:4
  80:10,14
**gps** 16:24,25
  17:3,6,11,20
  18:1,9,11,16
  19:13 21:16
  22:21 23:3,17
  24:12 25:11,14
  26:7,10,13
  27:7 29:21

34:2 40:25
41:4 46:3,3
47:11,25 48:15
48:21,25 50:12
50:22 78:21
80:19
**ground** 5:7
**group** 36:21
**guaranteed** 54:1
  54:4
**guess** 5:15 9:10
  9:13 10:22,22
  10:25 11:23
  11:11 38:12,14
**guessing** 5:18
  10:20 20:19,22
**guesswork** 58:6
**gutierrez** 1:5
**guy** 41:22 59:3
  66:25
**guys** 52:19 53:6
  53:13 71:17

───────
**H**
**h** 3:8
**hadnt** 27:11
**half** 51:17 60:10
  60:13,18 61:3
  61:22 63:5
  70:5 72:2
**hammonton**
  8:17 9:4,7,17
  10:5 13:6,16
  14:7 42:13,14
  55:5,10,18
**hand** 53:9,9
**happen** 52:12
  53:16 56:1
**happened** 56:4
**happens** 41:12
  41:17 51:25
  52:4
**happy** 54:14
  71:19
**havent** 37:14

**head** 27:20 71:7
**hear** 5:17
**heard** 63:14
**held** 1:16 29:13
  79:5
**help** 36:24 61:13
**helper** 57:18
**helpers** 75:23
  76:23 77:3
**helps** 75:6
**hernandez** 1:4
**hes** 12:7 21:15
  45:10 52:8,9
**higher** 29:14
  70:15
**hill** 1:17 2:4
  12:25 39:23
  40:1
**home** 35:15 36:3
**honestly** 9:18
**hour** 56:11 57:1
  64:6,18
**hourly** 75:22
  76:16,24 77:6
  77:9
**hours** 7:10 8:4,7
  35:4,9,17,25
  48:5,14,18
  49:2 50:3,17
  50:20 51:5,13
  51:16,16,22,24
  52:3,5,11,13
  52:25 53:22
  54:6 55:1,2
  58:20,25 59:7
  59:15,18,19
  60:2,6,10,19
  61:4 62:6,8
  65:17,18 66:7
  66:11,20 67:1
  67:14,16 68:7
  68:9,12,12,21
  69:15,20 70:3
  70:4,12 72:13
  73:11 74:13

───────
**R&K Reporting Inc.**

ANTHONY COLASURDO

87

75:5,6 78:9,13
79:2
**house** 38:24,24
39:5 42:15
43:4 44:1
**hypothetical**
43:24 45:16
59:12,24
**hypothetically**
72:12

**I**

**idea** 5:20 34:1
**im** 5:12 9:22
19:20,21 20:19
23:7,10 27:20
31:21 32:17
33:14 38:5
49:16 50:8
52:22 56:21
80:9
**immediately**
19:25
**implementing**
64:5
**important** 5:15
6:7
**imposing** 13:12
**impossible** 24:21
**incentive** 51:19
52:2,2 53:1,13
53:23 55:9,10
60:11 70:1,7,8
70:10,15,16
72:2 73:11
74:15 75:6
76:3
**include** 38:2
68:6
**included** 67:22
**includes** 68:5
**increase** 53:12
**independent**
64:16 65:4
**individual** 44:13

**individuals**
44:14
**industry** 35:14
**inferring** 41:2
**infers** 21:25
**information**
11:9,10 21:16
23:19 24:16
73:2,5
**informed** 39:3
**inside** 37:11
**install** 18:11
**installed** 24:23
24:25 46:4
47:25 48:15,21
50:12,22
**instance** 8:13
10:23 39:21
54:13,14
**instances** 52:18
57:7
**instruct** 49:16
49:24
**intend** 49:9
**interested** 54:17
**internal** 50:4
**internet** 64:16
**interrogatory**
51:3,12 70:3
**introduced** 5:2
**involve** 49:25
**involved** 58:7
**isnt** 24:4 40:7
57:19
**issue** 77:1
**ive** 11:19 38:21

**J**

**january** 15:2
27:21
**javier** 1:4
**jersey** 1:2,9,17
1:18 2:4,10 7:9
8:6,9 17:6,19
18:4 19:5,10

34:21 46:5
47:12,17 50:15
55:25 57:9
63:24 67:19
69:16 71:9
**jerseys** 79:16,18
79:21
**job** 6:10 29:8,8
42:3,5 66:14
66:16
**john** 43:24 44:2
44:3 72:12
**judge** 20:7,13
22:10,12 31:8
31:15,22,24
32:2,6,9,24
34:12
**july** 35:16
**jury** 6:4
**justify** 73:12
**justin** 2:2 5:1,3
71:5,14 78:24
79:1

**K**

**k** 1:22
**keep** 13:21 16:25
34:21 35:3,24
54:14,23 55:25
76:16
**keeping** 18:7
75:22
**kept** 76:10
**key** 8:19
**kimberly** 1:18
82:13
**knew** 76:8
**know** 5:22,23
6:20 7:17,19
7:21 9:13
10:24 11:8,19
11:25 16:3,9
19:18 21:1
23:10,17,23
24:10 25:1,9

28:1 30:2 31:6
32:18 33:25
38:12,23 39:1
39:10,11 41:5
41:21 43:6,9
43:12,19,20
46:15 49:20
52:9 54:16,20
55:12,14 56:3
56:21 57:9,11
60:19 61:1,5,9
61:17 63:3
65:3,13 68:22
73:24 75:22
77:1
**knowledge** 16:17
21:14
**knows** 21:13

**L**

**l** 2:2
**labor** 36:13
60:17 61:1,19
62:21 75:25
**landscaper**
66:17
**law** 1:16 60:16
62:1 64:19
**lawsuit** 18:24
36:10 63:21,21
65:3 77:13
**learned** 59:12,13
**leave** 13:7,17
14:8 15:16
16:10,18
**left** 14:16 16:21
18:17 19:11
24:4,11 46:8
**legal** 63:22 80:5
**levenson** 2:8
**levittown** 1:23
**lights** 8:19,20
**likewise** 6:13
**limitation** 13:12
**limited** 21:2

**limits** 30:19
**line** 3:15 34:15
**lisa** 22:25
**litigation** 63:19
**little** 1:18 48:12
50:2 82:13
**livable** 35:13
**live** 39:23
**llc** 1:16 2:2
**load** 25:25
**location** 9:4,7
10:5 26:1
43:16 45:16
**locations** 40:2
**lock** 8:20
**long** 5:4 6:25
18:4 19:16
25:19 29:13
61:21 65:11,12
65:15 79:12
**longer** 18:13
22:2 34:11
35:11 52:24
53:4,8,9 54:12
54:20
**look** 41:4 46:10
56:24 57:23
**looking** 21:11
25:20 58:5
75:8
**looks** 46:22,24
47:5
**lopez** 23:8,8,9
**lost** 49:23
**lot** 22:1 36:1
56:17 66:23

**M**

**m** 1:17 2:9 44:3
44:4 50:9 79:6
79:6 81:13
**mad** 38:15
**maintaining**
18:5
**majority** 76:24

77:3
**malesich** 63:2
79:9
**man** 29:4 35:20
57:19,20 59:6
70:13 76:4
**management**
15:14,25
**manner** 38:16
**marco** 1:5
**marked** 3:9,10
34:10,18 43:5
45:15 46:14,19
50:13
**marking** 47:6
**marlton** 1:16 2:3
**material** 51:5,7
**matter** 39:4 82:8
**maximum** 51:23
**mean** 5:16,17,19
9:12 11:3,11
15:10 17:8
21:1 23:7 26:2
27:1,4,21 37:7
41:21 52:24
53:8,12,19
63:18,19 66:11
67:6 79:16
80:3
**means** 6:19 11:5
28:2,13,17
67:7 82:19
**meant** 11:7
28:20 29:18
**meet** 43:4
**memory** 56:4,7
56:19,20
**men** 35:14
**mentioned** 24:12
36:10
**methodology**
71:5
**michele** 23:2
**midafternoon**
55:12

**mind** 11:8 59:11
77:21
**minimum** 35:9
51:14,16,18
60:9,13,14,19
61:3,5,21 63:5
66:19,20 70:4
70:6 72:2 74:1
76:2 77:10,12
77:14
**minute** 26:25
**mischaracterize**
75:19
**mischaracteri...**
75:14
**mistake** 6:19
**money** 35:21
53:7 54:5,21
59:5 66:1,21
77:5
**month** 10:14,16
10:19 13:6,8,9
13:10,14,16
14:7,11,18,21
14:23,24 15:1
14:20
**monthly** 15:5
**months** 14:14
18:13 27:3,4,8
27:22 29:24
**morales** 15:20
16:3,9 19:21
21:9,12 22:21
23:12,15 24:2
34:20 41:7,13
42:3,5,10,19
43:1,10 46:19
46:22,23 47:1
54:9
**morales1** 47:4
**morning** 8:14,25
10:6 13:17
14:9 15:15
16:4,19 18:18
24:4 42:1

55:14
**mornings** 15:16
55:12
**mouth** 38:6
**move** 33:13 34:8
45:4 75:21
**movements**
17:16
**moving** 33:14
45:19
**multiple** 74:5
**multiply** 71:24

### N

**n** 3:1 82:2
**name** 4:17,20
5:1 21:21
29:12 43:24
**names** 21:22,23
22:1
**national** 36:13
**nature** 56:10
**necessarily** 9:3
36:6
**need** 7:2 20:2
21:16 22:15
28:6 37:21
50:5 54:15,16
54:18 55:20
57:17 61:17
70:1 73:6 74:4
76:15
**needs** 12:8 35:20
42:3 49:19,19
**never** 13:20
19:13 33:6
35:6 38:21
52:12
**nevertheless**
22:15
**new** 1:2,17,18
2:4,10 24:3
**niedelman** 2:8
**night** 8:15,20
9:1

**nonexempt**
67:16
**nonsensical** 30:9
**noon** 10:2
**normally** 8:24
54:12
**notary** 1:19
82:13
**note** 50:9
**noted** 81:12
**notes** 43:11 82:7
**notice** 6:9
**number** 30:3,17
34:5 41:8
58:25 68:7
69:2 70:11,18
72:4,23 73:3
73:11,13,14
74:4
**numbers** 76:5

### O

**o** 82:2
**oath** 4:14
**object** 20:5 49:9
72:20 75:13
**objecting** 80:18
**objection** 12:1,6
12:16 13:18
14:1,10 15:8
16:12 17:23
20:9 22:4 24:5
28:4 30:5,12
30:22 31:6
33:2 37:17
39:8 40:4
41:15 43:7
44:18 45:7,24
48:7 49:4
50:23 52:15
56:5 58:2,21
59:21 60:21
61:7 62:10
63:8,25 65:6
65:20 66:8

67:24 68:14
69:23 70:25
72:5 73:7,15
74:9,18 76:18
78:10,22 80:6
**objections** 4:8
12:10
**obviously** 36:24
**occasions** 41:8
55:4,8,19
57:25
**occurred** 19:13
78:20
**occurrences**
56:1,4
**offer** 61:12
**office** 8:23 13:1
21:10,20
**offices** 1:16
**oh** 46:11
**okay** 5:5 7:10,24
8:12 9:6 10:4
10:10 11:16,21
11:24 13:3
14:21 15:1,4
16:17 20:6
21:24 22:1
23:3 24:18
26:24 27:6,10
31:25 32:11
34:7,24 35:3
38:20 39:16
40:11,16 41:20
44:7 46:3 47:9
49:11,14 51:2
51:11 52:10
58:10 62:3
63:4,6 65:10
66:6 67:10,17
76:8 79:3
**old** 18:10
**once** 10:14,16
13:6,9,10
24:20 36:10
**onkay** 25:23

ANTHONY COLASURDO

89

**open** 8:14
**opened** 8:16
**opinion** 29:11
35:7 53:4
**opportunity**
75:17
**opposed** 66:16
**option** 39:24
54:21
**order** 75:23
**ortega** 1:6
**outer** 30:19
**outside** 37:14
**overall** 66:4
**overcompensa...**
76:9
**overtime** 51:17
58:16 59:2,3
60:5 65:18
66:2,7,23
67:12,17,20,21
68:4,7,9,13,17
68:21 69:17,20
70:5,14 71:16
74:14 75:5
76:6
**owe** 67:17,20
72:19 73:3
74:6

_____

**P**

**p** 1:17 2:8 50:9
79:6,6 81:13
**page** 3:3,9,15
47:5
**paid** 51:4,15
52:8 53:6,11
59:16,17,18
60:3,5,5,9,12
66:2 67:11,15
67:21 68:3,17
69:16,19 70:3
71:15 74:13
76:23 77:6,11
77:13

**paraphrasing**
56:21
**pardon** 4:19
**part** 29:7 36:16
36:18,19 37:25
38:8 52:1
57:15 68:2
70:2 77:12
**particular** 8:11
25:19 28:8,18
38:21 43:10
44:9 45:12
52:6,7 53:7,14
57:8
**parties** 4:5
**partner** 62:1
**passenger** 38:8
38:11
**pay** 35:15,16,23
43:12 47:7
60:18 61:2
62:3 63:24
66:12,22 71:22
78:16,17 79:25
**paying** 59:9
73:25
**payroll** 53:5
**penalize** 59:8
**pending** 7:3
11:13,17 61:16
**pennsylvania**
1:19,23
**people** 15:22
21:2,7,9,18,19
21:20 23:3,13
23:16 42:2
**perfectly** 5:6
**period** 17:2,3
28:15 37:20
47:7
**person** 21:12,15
32:18 50:5,5
57:8,13 63:23
67:14,16,17
74:6 75:11

**personal** 11:1
16:17 29:11
**personally** 8:18
16:20 26:12
**persons** 29:12
71:22 74:2
**phone** 1:24 20:8
63:14 75:24
**phrase** 28:1
73:21 74:24
**phrased** 28:18
**phrasing** 73:18
**physical** 9:4,7
36:2
**physically** 37:6
**pick** 36:3 39:6
39:20 40:1
43:16 78:3,4
**picked** 42:16
43:25
**picking** 26:3
37:4,12 38:18
40:20 44:16
45:2
**pickup** 26:5,8,11
26:14,22 29:22
34:3 36:25
44:2,3,7,11
45:16 55:13,14
56:18 77:23
**piece** 11:10
**pieces** 73:1,5
**pike** 1:17 2:3
**plaintiff** 49:2
**plaintiffs** 1:7 2:5
68:4
**please** 4:17,20
6:12 21:21
22:21 26:9
46:11 48:10
60:24
**po** 1:23
**point** 64:20,23
**policies** 64:6,18
**policy** 65:15,19

**posed** 38:22
**position** 37:2
44:23 45:4,17
48:20 58:12
60:4,9 69:15
**positions** 67:19
68:3
**possession** 17:20
**potential** 58:15
**practices** 63:24
**preferences** 50:4
**presentation**
74:22
**preserved** 49:19
49:19,24
**pretty** 41:14
**previous** 34:25
**previously** 34:18
46:14,19,25
**print** 17:9 24:17
**printed** 17:8
**prior** 39:5 47:11
47:25 48:14
63:21
**privileged** 64:1
**probabilistic**
57:12
**probably** 5:8
50:2 64:2,25
65:24
**problem** 9:14
41:11,14 76:10
76:11
**problematic**
35:7
**proceedings** 4:2
41:25 82:5
**produced** 19:5
**production**
80:18
**professional**
1:18
**program** 21:4
**promise** 22:13
**properly** 18:19

18:23 49:24
**public** 1:19
82:13
**pull** 21:10 24:13
**pulls** 37:24
**punch** 36:2,6
**purpose** 71:12
**purposes** 67:7
**put** 8:19 20:2
38:6 53:13
62:15 69:3
80:21
**putting** 37:8

_____

**Q**

**question** 4:9
5:18,19,24 6:3
6:12,15 7:3,12
9:8,19 10:13
11:13,17,20,24
12:9,12 13:25
14:4 16:7 17:5
21:4,8 22:16
22:18,20 24:8
27:25 28:8,19
29:17,19 30:8
30:11,16 32:13
33:4,21 34:7
35:22,23 36:9
38:16,22 39:22
58:8 59:11
61:16 62:1
67:8 74:1,21
75:1,4 80:10
**questioning**
34:16
**questions** 5:16
11:5 24:22
28:2,12 30:8
**quite** 27:15

_____

**R**

**r** 1:22 82:2
**raise** 17:14
79:24

raising 22:7
ran 25:10
range 9:12,16
  13:5,8,10
  18:14 30:21
  31:2,12 34:5
  35:18
rare 69:5,8,11
  69:13
rate 51:4,17,21
  51:24 53:12,14
  54:1 58:18
  59:20 60:3
  62:3 63:4 64:7
  65:16,23 66:1
  66:3 67:11,22
  68:5,6 69:18
  70:5,15,16
  71:15,15,25
  72:4,14 73:4
  73:11,14 74:5
  75:8 77:9
read 33:17
ready 38:18
real 7:22 8:3
really 57:20,22
  64:17 66:18
  68:16 72:1
  74:13 75:6,8
reason 6:11 7:2
  38:17 65:11
reasons 67:20
recall 26:18 33:5
  33:7,13,14,18
  33:23 63:10
  80:2,3,8
recess 79:5
recognize 54:11
  68:23 77:4
recollection
  57:22
record 4:18,21
  5:3 11:12,22
  46:22 47:22
  50:8 55:2

76:10 79:1
81:2,3
recorded 17:16
records 16:25
  17:4,7,20 18:1
  18:5,7,16,25
  19:4,6,10,13
  19:17,24 20:17
  20:23,24 21:16
  34:22 35:4,24
  40:17,21,24
  46:3,6,6 47:12
  47:17 48:2,4
  48:15,15,17,22
  48:25 49:1,8
  50:12,13,14,16
  50:20 53:5
  54:25 57:10,22
  69:7 75:22
  76:16 78:19,21
  80:19
redefine 10:21
refusing 32:4
regarding 16:18
  19:10 35:4,25
  40:18 46:7
  47:13,17 48:2
  48:5 49:2
  50:20 63:23
  79:25
regardless 32:11
  54:6 62:14
regards 34:15
  65:2
registered 1:18
regular 51:16
  67:13 68:12
  70:4 74:14
  75:5
regularly 10:10
relate 19:1
relating 17:7
relations 36:14
remember 11:2
  13:24 14:3,6

14:15,19 15:7
27:15 28:25
29:12,16 64:13
65:8 80:13,15
remembered
  29:20
remembering
  29:15
repeat 5:25
  25:12
repeated 29:19
repetitive 78:18
rephrase 5:25
  45:1 48:12
  55:7 64:3
rephrased 75:2
replace 42:4
report 40:3 41:4
  44:8 45:6,13
reporter 1:18,19
  6:9 62:15
  82:22
reporting 1:22
  1:22 44:12,17
  44:24 45:22
reports 40:25
represent 67:4,6
representing 2:5
  2:12
reproduction
  82:19
request 20:1
  49:8,9 55:6
requesting 54:22
requests 3:14
  55:20
require 43:11
  50:3 54:19
  56:11 61:2
  73:2
required 44:8
  45:5 54:12
requirement
  72:18
requires 12:24

60:17
research 64:16
  64:17 65:5
reserved 4:9
reserving 19:19
  19:20,21
residence 37:3
  37:15 38:9
  39:6 40:7,14
  77:24 78:2,4
residences 40:8
residential 26:4
  26:8,11,14,21
  27:8,18 29:22
  34:3 36:25
  41:1 45:20
  56:18
respect 63:18,20
  64:6
respective 4:5
responses 29:7
  51:3
return 55:15
returns 55:10
reviewed 25:14
  26:13,20 27:7
  27:18 29:21
  30:1,20 34:2
richard 63:2,3
  63:15
riding 39:13,17
right 6:10,24 9:9
  17:19 19:19,19
  19:20,22 22:8
  28:23 29:19
  47:8 57:6
  59:24 68:20
  69:6 71:12,24
  74:8
rodriguez 23:4,6
  23:8
room 63:14
route 25:20,24
  25:25 27:8
  38:24 39:24

41:2,5 44:1
45:20 55:18,21
55:24 57:2,8
57:12,16,17,19
routes 39:1
  55:23 56:9,15
  56:24,25 57:25
rpr 82:13
rule 5:14 6:7 7:3
  7:16
rules 5:8,9,11
  36:13
run 12:23,23
  21:2,7 25:18
  25:24 26:7,10
running 21:3
runs 8:24 21:5,6
  26:14

**S**

s 3:8
sanitation 1:9
  7:9 8:6 17:6
  18:4 19:5
  34:21 63:24
  71:9
saved 20:24
  49:18
saying 48:3
  52:22,22 65:1
says 33:5,12,14
  79:1
schedule 47:6
scheduled 57:18
schedules 46:24
screen 17:14
sealing 4:6
seasonality
  56:16
second 6:7 29:3
  57:18
see 21:11 25:19
  41:1,4 53:6
  56:23
seen 69:7

ANTHONY COLASURDO

self 50:6
sense 14:4 32:14
  61:13 68:11
services 1:22
set 43:17 76:7
sheet 58:5
short 37:20
  55:22 57:16
  59:5
shorter 20:23
  35:11,18 56:9
  56:15 57:13
shorthand 82:22
show 18:16,20
  34:9 40:21
  41:9,9 42:2,4
  42:12 45:9
  46:6 54:25
showing 42:6,7
  42:23 47:22
  78:19
shut 8:20
signing 4:6
similar 36:22
similarly 1:7
single 47:5
sir 23:18 31:2
sister 7:23
sit 32:20
sitting 6:9 76:16
situated 1:7
situation 53:1
six 14:14 51:23
  52:8 68:25
  69:5,8,13
skills 21:3
smith 43:24 44:3
  72:12
smiths 44:2
somebody 24:15
  42:20 67:11
sorry 23:7
sort 42:3 57:10
  65:16 70:17
  71:25 73:12

south 1:9 7:9 8:6
  8:9 17:6,19
  18:4 19:5,10
  34:20 46:4
  47:12,17 50:15
  55:25 57:9
  63:24 67:19
  69:16 71:8
  79:16,18,21
speak 6:8 19:25
  22:9 31:22,23
  32:9 50:5
speakerphone
  63:13
speaking 12:10
  12:23 31:5
specific 34:5,21
  35:3 38:23
  40:2 43:5
  44:11 45:14
  57:7,24
specifically
  26:21 59:14
  80:22
specify 28:7
speculate 44:21
speed 61:12
spend 8:3,5
split 65:17,19
splits 68:11
spot 40:1 45:10
stab 5:21
standard 29:14
  66:12
standards 60:17
  61:2
standing 37:13
start 6:13 8:9,21
  37:8 38:18
  40:20 44:1,15
  45:18 71:23
started 18:7
  31:20 37:12
  44:16 71:21
starts 37:3,5

38:1 40:19
  41:1,6 45:1,2,5
  45:19 70:21
  72:3 77:17
  78:2
state 4:17,20
statement 43:21
  43:22
states 1:1
station 13:17
  19:11
stenographic
  82:7
stop 31:7 41:6,6
straight 77:6
strange 52:10
subpoenaed
  53:6
suite 1:17 2:3
supervision
  82:21
supplied 46:25
suppose 11:1
  77:8
supposed 42:7
  42:14,16 43:3
  43:4 45:10,13
  45:15 52:23
sure 15:24 28:11
  32:2 51:8 71:2
swartz 1:16 2:2
swidler 1:16 2:2
  2:2 3:4 4:16
  5:1 7:18 12:3,8
  12:13,21 13:23
  14:2,13 15:13
  16:16 17:25
  20:2,6,12,16
  22:11,19 24:14
  28:10 29:5
  30:10,15,24
  31:1,5,10,25
  32:10,16 33:1
  33:6,12,20,24
  34:17 38:4

39:12 40:6
  41:19 43:14
  44:22 45:11
  46:2,13 47:2,8
  47:10 48:11
  49:7,11,14,15
  51:1 52:21
  56:14 58:9
  59:10 60:1,25
  61:10,24 62:17
  63:12 64:2,4
  64:14,22,24
  65:9,25 67:3
  68:1,19 69:24
  71:11 72:10,24
  73:10,20 74:11
  74:23 75:3,12
  75:16 77:7
  78:14 79:3,8
  80:12,17,23
  81:4,8
sworn 4:13 51:2
system 18:9,11
  21:1,4,5,13,14
  22:21 23:4,17
  23:23 24:12,24

T
t 3:8 82:2,2
take 6:10 7:2
  19:16 39:24
  50:1 67:5
taken 39:19 82:7
takes 38:2
talk 20:8 31:19
  80:1
talking 14:12
  23:10,14 75:11
technology
  16:22
tedious 27:15
tell 5:23 11:2
  13:13 18:15
  21:21 22:21
  24:15 32:7

50:16 62:5
  74:24
telling 32:3 50:8
  63:15 80:4
ten 65:13 71:21
  74:13
tend 53:9
tends 57:12
term 40:19
testified 4:13
  12:7 30:23
  34:24 41:24
  42:10 62:4
testify 6:25 12:4
  12:14
testifying 6:20
testimony 31:4
  33:25 34:19,20
  40:9 52:12
  62:7 75:15,19
thats 9:3 13:11
  15:4 22:1 29:7
  37:19,25 41:2
  45:2 53:15
  56:12 57:6
  60:8 62:13,16
  62:19 65:23
  72:8 74:15
  76:9
theres 41:7
  56:10 66:23
theyll 39:14
theyre 35:17
  42:22 74:16
thing 33:17 75:7
things 5:16
  12:24 13:4
  15:11 36:14
  74:4 80:1
think 10:21 15:4
  19:12 21:25
  25:16 28:6,13
  28:16,17 29:20
  32:25 37:19
  38:15 44:20

ANTHONY COLASURDO

58:10 62:13
65:22,23 66:22
75:18 79:15
80:24
**thinking** 27:20
**thinks** 80:4
**thought** 6:19
24:7 28:24
35:13
**three** 14:25 34:9
49:13 57:23
**thrower** 38:23
38:25 40:18
42:6 51:23
52:4,14 53:2
55:8,17,19,23
56:25 57:18
60:2 77:21
78:25
**throwers** 19:1
34:22 35:4,23
36:1,16,24
37:5 39:1,3
41:9 42:4
47:18,23 48:5
48:14,18 50:17
50:21 51:3
53:21 55:5
57:25 58:12
59:13 62:8
64:7 68:22,24
75:23 76:16
78:8,20
**thursday** 25:16
**time** 4:10 8:2,5,8
9:6 16:5,20
17:2,3 18:17
18:20 19:1,5
22:6 24:3 25:2
25:10,13 26:16
28:7,19,23
29:3 34:21
36:6 37:20
38:2 39:4
40:18,22 43:5

43:17 44:2,4,7
44:7,12,12,17
44:23,24,25
45:14,23 46:7
46:23 47:13
51:16 54:15,18
54:18 58:13
60:10,13,18
61:3,22 63:5
64:21,23 65:12
65:12 67:13
70:4 72:2 76:8
80:21,24 81:12
**times** 10:18 13:9
13:15 14:7,15
14:22,25 15:3
16:9,18 24:10
24:24 25:4,6,8
26:19,20 27:9
27:10,19 29:23
30:1,20 31:13
32:19 33:4,10
34:1,2,2,5
35:19 51:18
66:20 70:6
72:4
**today** 5:8,11,14
6:3,7,18 12:10
12:25 22:2
25:15 27:21
49:20 76:17
**told** 5:9 9:10
31:12 38:25
61:19,21 62:2
62:7
**tomljenovic** 2:9
7:14 12:1,6,16
13:18 14:1,10
15:8 16:12
17:23 20:4,11
20:14 22:4
24:5 28:4 30:5
30:12,22 31:3
31:7,14,18,23
32:8,23 33:3,9

33:16 34:13
37:17 39:8
40:4 41:15
43:7 44:18
45:7,24 46:12
46:21 47:4,9
48:7 49:4,10
49:12 50:23
52:15 56:5
58:2,21 59:21
60:21 61:7,15
62:10 63:8,25
64:9,20 65:6
65:20 66:8
67:24 68:14
69:23 70:25
72:5,20 73:7
73:15 74:9,18
74:25 75:10,13
76:18 78:10,22
80:6,20 81:1,7
**tony** 4:23
**top** 76:3
**total** 72:3
**tovilla** 1:4
**track** 13:22
17:13,15 18:12
36:25 54:23
55:25
**tracks** 22:22
**transcript** 82:9
82:18
**transportation**
36:4 39:20,25
**trash** 26:4,8,11
26:14,21 29:22
34:3 37:4,8,13
37:24 38:10
39:6 40:21
45:19 78:3,4
**traveling** 37:21
37:23
**trial** 4:10
**tried** 33:18
38:14

**truck** 16:21
18:17,21 19:6
21:10,17 23:20
26:8,11,14,22
27:18 29:22
35:23 37:9,11
37:12,14 38:3
38:8,11,17
39:13,18 40:13
40:13 41:1
42:25 43:3,4
43:16 45:6
47:13,18 55:13
56:12 58:14
**trucks** 10:6 13:7
13:16 14:8,16
15:16 16:10,18
17:1,4,7,20
18:2,12 19:11
22:22 24:3,11
25:14 34:3
46:4,8 48:1
55:15
**true** 24:2 67:5,9
**truthfully** 30:18
**try** 48:17 65:4
**trying** 27:12
38:6 48:13
56:23 72:25
75:19,20
**tuesday** 1:13
25:15 50:9
**turn** 8:19
**turned** 19:25
**twice** 13:7
**two** 5:16 7:25
51:16 53:8
57:1,25 65:18
66:6,10 68:12
70:4 73:1,5
74:3,14 80:24
**type** 10:23
**typical** 8:10 11:4
13:4
**typically** 8:8,21

9:17,20,22
10:8,9

---

**U**

**unannounced**
41:10
**understand** 5:18
5:24 6:1,16,21
7:5 8:12,13
11:11,15 13:3
17:5,10 19:8
27:12 28:12
30:11,13,16
32:1 38:7
40:11,17 55:16
57:21 58:11
60:16 69:8
71:12,19 76:15
76:17,20,22
80:17
**understanding**
67:18,23
**understood** 6:5
**unfortunately**
50:1
**union** 35:1 36:10
36:11,13,17,18
41:24
**unit** 36:20
**united** 1:1
**use** 21:13 23:3
23:17,23 35:18
36:3 43:23
54:16 57:4
77:17
**uses** 22:21

---

**V**

**valentines** 25:17
**variables** 56:17
75:5
**vehicle** 17:13,16
24:13 37:9,22
37:23
**vehicles** 17:11

ANTHONY COLASURDO

93

17:16
**venture** 8:3
**video** 16:23 41:3
**viewed** 32:19
**vineland** 39:23
43:2,25 44:2
44:10 45:19
**vs** 1:8

─────────
**W**
**wage** 35:9,13
51:14,16,18
60:9,13,14,19
61:4,5,21 63:5
64:6,18 66:20
66:20 70:4
72:2 74:1 76:2
77:6,10,12,14
**wagenheim** 2:8
**wages** 75:7
**wait** 7:14 26:25
**waived** 4:7
**walk** 38:3
**want** 5:21 7:17
10:21 11:21
12:22 21:22,23
22:14 23:19
28:11,15 32:1
32:1 38:6,12
39:25 40:11
45:3 46:12
54:14 55:11
57:4 62:6 65:3
67:8 71:18
75:1 76:23
77:2 81:6
**wanted** 25:19
**wasnt** 24:11
26:2,4 29:17
35:22 63:13
75:22 76:10
**way** 22:2 28:12
28:18,21 39:21
42:11 51:11
58:7 59:14,19

62:3 64:17
67:18 69:3
72:11 73:18
74:21 75:21
76:1,12,14
78:1 79:25
80:4,11
**ways** 49:20
**week** 7:10 8:3,6
25:15 43:13
47:22 52:10,14
58:20 59:15,17
60:3,4 62:6,9
67:14 68:18,24
69:12,20 70:1
71:18,23 72:14
73:4 74:6
75:11
**weeks** 77:15
78:8,19
**went** 5:11
**wild** 5:21
**william** 1:4
**willing** 32:12
**wish** 36:4
**witness** 3:2 7:1
7:15 12:11,18
13:20 14:11
15:9 16:14
22:5,17 24:7
28:6 29:2 30:7
30:13 31:16,21
32:5,11,25
34:11 37:19
39:10 41:17
43:9 44:20
45:9 46:1 48:9
49:6 50:25
52:17 56:7
58:4,23 59:23
60:23 61:9,17
62:12 63:10
64:13 65:8,22
66:10 68:16
71:2 72:7,22

73:9,17 74:20
76:20 78:12,24
80:8 81:10
**wont** 33:7
**word** 10:21 11:6
54:17 57:4
77:1
**words** 38:6
39:16 40:20
53:20 70:16
**work** 7:11 15:23
35:5,25 36:5
37:6,13,16
38:19,19 39:4
39:5,20 41:9
41:23 42:2,8
42:12 43:18
44:5,23,25
45:1,5 47:18
52:13 53:2,3,8
53:9,22 54:5,6
54:19 55:23
57:8 58:13,15
58:19 59:1,3
66:14,15 69:2
69:2,3,5,8,11
69:18,20 71:8
71:14,18,24
76:3,4,5 78:8
**workday** 38:1
40:19 44:14
45:18 59:15
77:17,18,19,20
78:1
**workdays** 35:11
35:12
**worked** 19:2
47:7,14,23
48:5,14,18
49:3 50:17,21
51:5,23 52:8
54:11 55:1
57:25 59:15
60:2,4 61:4
62:5,8 67:14

67:15 69:14,15
69:17 70:12,13
72:13,18,23
73:4,14 74:4
75:5,9 78:25
**worker** 70:20
**workers** 71:8
**working** 8:5
13:2 18:19,23
39:14,22 44:1
52:24 68:24
**works** 52:4,11
59:4,6,7 66:25
70:23 73:1
76:7
**wouldnt** 29:8
45:18 57:9
69:1 72:15
76:21
**writing** 20:3
80:22

─────────
**X**
**x** 3:1,8 53:22,22
70:17

─────────
**Y**
**yard** 14:8,8,16
14:16,22 15:15
15:17 16:4,10
16:19,21 18:17
18:21 46:8,8
55:5,11,18
**yeah** 19:15 24:7
41:18 66:11
**year** 18:6,8,9,14
20:18,20 24:23
26:20 27:1,3
27:11,12,17,23
28:2,3,13,20
28:21,22 29:18
29:23 35:10,19
48:22 50:21
77:5
**years** 57:24

65:13,14 71:21
76:1 79:14,22
**young** 29:4
**youre** 5:18,20
20:20 24:21
28:7 29:6 32:3
32:3 41:25
54:17 73:18,25
75:7 80:18
81:8
**youve** 13:5
27:17 34:7
41:24 53:5
74:3

─────────
**Z**
─────────
**0**
**00** 8:15,21,24,25
8:25 9:20,23
9:23,24,25
42:1 55:15
**07** 3:17
**08003** 1:17 2:4
**08401** 2:10

─────────
**1**
**1** 1:11,17 27:21
47:1,3 50:14
**10** 1:17 2:3 8:4
8:25 29:23
30:3 31:13
51:13,22 52:5
52:11,13 59:18
69:19 79:14,22
**100** 41:22 60:3
71:15 72:14
**10cv05647** 1:11
**11** 8:15
**1125** 2:9
**12** 27:3,4,8,22
29:24 55:15
67:15
**14** 50:9
**14th** 25:17

Phone: 215-946-7009                    rkreporting@gmail.com

ANTHONY COLASURDO

**1878** 1:16 2:3
**19** 1:13 3:16,16
  82:8
**19058** 1:23
**1972** 1:23
**1978** 41:5
**19th** 25:16 50:10
**1a** 34:18 46:7,19
  47:3
**1b** 34:18 46:7,19
  46:23 50:14
**1c** 34:19 46:7,20
  46:22 50:14

---
**2**

**2** 50:9 79:6,6
  81:13
**20** 25:6 33:4
  34:1,6
**2013** 1:13 28:2
  28:14 82:8
**2159467009** 1:24
**2159491867** 1:24

---
**3**

**30** 1:17 8:14
  19:22 44:2,4
  49:13

---
**4**

**4** 3:4 8:14
**40** 60:10,10,19
  61:4,22 62:6,8
  63:5 78:9,12
  78:17
**40hour** 68:18
**42** 72:13
**43** 79:6
**45** 59:15 60:2,11
**48** 79:6
**49** 3:17

---
**5**

**5** 42:1 44:2,4
**50** 25:8 58:19
  59:19 69:15

**500** 34:2,6
**53** 81:13
**56** 66:21 67:2

---
**6**

**6** 19:22 49:13
**60** 8:7 67:14
**6095727438** 2:10

---
**7**

**70** 41:5
**75** 8:7

---
**8**

**8562833525** 2:4

---
**9**

**9** 8:21,24,25
  9:20,23,23,24
  9:25